[Crim. No. 24571. Second Dist., Div. Three. May 22, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
GOURGEN MKRTICH YANIKIAN, Defendant and Appellant.

COUNSEL

Lindsey & Newman, James T. Lindsey and Vasken Minasian for Defendant and Appellant.

David D. Minier, District Attorney, for Plaintiff and Respondent.

## Opinion

**POTTER, J.**—Defendant, Gourgen Mkrtich Yanikian, an Armenian by birth, was found guilty by a jury of the first degree murders (Pen. Code, §§ 187, 189) of two Turkish consular officials, which occurred on January 27, 1973, at the Santa Barbara Biltmore Hotel.

He appeals from the judgment of conviction on each of two counts of first degree murder committed while "armed with and using a deadly weapon—namely, a firearm."

Defendant was tried on a plea of not guilty entered by the court when he remained mute at arraignment. Defendant was represented by at least two retained counsel throughout the proceedings. Such counsel were, on more than one occasion, urged by the Presiding Judge of the Superior Court of the County of Santa Barbara to enter a plea of not guilty by reason of insanity. They had been provided with a copy of three reports of Dr. Patterson, a psychiatrist who had examined the defendant in behalf of the prosecution, in which he had stated his impression that defendant had a mental disorder "of such a degree that it forms the motivation for the offense of homicide, and impairs his responsibility under M'Naughton." Despite such urging and the receipt of such information, the plea was not made.[1]

At the trial defendant made no attempt to dispute the fact that he had committed the two homicides. His defense was based entirely on his claim of diminished capacity.

In support of this defense, defendant testified at great length in his own behalf. His testimony, which consumes over 600 pages of the trial transcript, detailed his entire personal history practically from his birth in 1895 of Armenian parents in Armenia. In such testimony defendant detailed the harrowing circumstances under which Armenians lived during his early years in light of the alleged official Turkish government policy of genocide against all Armenians. Defendant described numerous traumatic experiences involving alleged atrocities against various close members of his family, including the death of an older brother who was revered by him. Defendant recounted his participation in Armenian counter-activity as a

---

[1]There does not appear to be any *Ibarra* question posed by this determination. At the time of the trial defendant was over 77 years of age. If he had been found not guilty by reason of insanity on the basis of the paranoid conviction to which Dr. Patterson's report referred, his future freedom would have depended upon his sustaining the burden of proving that his sanity was restored, that is, that he was a person no longer constituting "a danger to the health and safety of others." (Pen. Code, § 1026a; *In re Franklin*, 7 Cal.3d 126, 145 [101 Cal.Rptr. 553, 496 P.2d 465].) The strategy decision against the plea was clearly justified.

member of a student volunteer group and described seeing gruesome evidence of wholesale massacres of Armenians in the course of those activities.

Defendant's narrative also included the history of his education in Russia, his becoming an engineer, and his later immigration to Persia where he became successful as proprietor of a large construction company engaged in government contracting. His contribution to the Allied war effort during World War II, in the form of the construction of a vital railroad link, and his donation of his land and water supply for use by the Allied military was related. According to defendant, his later immigration to the United States was facilitated by these contributions to the war effort. He told of his life in the United States, after his arrival in 1946, depicting himself as a person who made substantial contributions to the culture, education and well-being of mankind. His activities included producing and directing stage productions, speaking and writing on matters of public interest, and inventing emergency rescue equipment.

According to defendant, throughout all this period he retained a consuming interest in focusing world attention upon the great injustice which he believed had been committed against his people by the Turkish government. He read numerous histories presenting the matter from the Armenian point of view including one written by Ambassador Morgenthau. He wrote and spoke extensively on this subject and his burning ambition was to carry out a project to produce a film depicting the massacres, to be shown to world-wide audiences without charge. He was aware of the fact that a major studio had abandoned production of such a movie as a result of diplomatic pressure, so he resolved that he would use his own personal fortune for his purpose. His main reliance for financing this project was on a claim against the government of Iran, growing out of his construction of the railroad during World War II, in respect of which he had not received the final $1 million payment. He finally succeeded in obtaining a judgment in the courts of Iran only to have the Shah forbid satisfaction of the judgment. His further efforts to pressure the Shah, through the American Department of State, were finally cut off by the State Department terminating its consideration of the matter in April 1972.

According to defendant, this final destruction of his dream of producing the movie to leave a lasting historical imprint caused him to isolate himself for three days in his apartment during which time he went over in his mind the terrible events of his youth and the sufferings of his people caused by the massacre orders allegedly issued by the Turkish government. He came to the realization that he could not focus the light of world attention upon

these injustices in the manner he had intended, and that he must seek an alternative method. His decision was to accomplish this by killing two Turkish government officials, thereby to "destroy two evils" and precipitate, through his trial, a public examination of the subject of the massacres of Armenians to the end that all people would benefit by the knowledge.

This plan, which was conceived in April 1972, was, according to defendant, meticulously implemented over the intervening months between that time and the date of the actual homicides on January 27, 1973. His final plan was to lure the two Turkish consular officials to a cottage at the Santa Barbara Biltmore on the pretext of presenting the Turkish government with some historic memorabilia. He abandoned an original plan under which he would carry out the homicides in the consular offices, on the ground that upon visiting such offices he observed the presence of numerous employees who "might try to be heroes and get hurt." To avoid the risk of harming anyone other than the government officials, defendant devised the plan of having the delivery occur at a Biltmore Hotel cottage in Santa Barbara. The arrangements were completed, the consular officials indicated their concurrence in the plan, and the stage was set for defendant to enact his role.

Defendant's preparations, as told by him, included disposing of substantially all of his personal effects, including his automobile, and taking with him to the Biltmore various personal items which he did not expect to be able to obtain in jail. He prepared a hollowed-out book to carry his Luger pistol, and took with him another small automatic pistol. The consular officials arrived and defendant carried out his plan. Each of them was felled by bullets from the Luger and while lying face down on the floor each was administered a fatal *coup de grace* in the head with the smaller pistol.

To generate maximum public attention, which was the purpose of his act, defendant carefully timed the distribution of a press release explaining his conduct, and of numerous letters to persons of Armenian parentage so that they were received at or about the time the homicides became publicly known. The letters spoke of his personal war against "the Turkish beasts and their government" which would be started by the time the letter was received. The press release expressed his determination to do everything in his power to publicize his act, stating in this connection, "I will ensure that they will arrest me and I will continue to defend my rights before a world court."

The purpose of all of defendant's testimony was made clear near its conclusion when he denied that he had "killed two men" in the hotel room and insisted that what he did was "destroy two evils" in order to have a

symbol with which to focus world attention upon the Armenian massacres. According to defendant, the victims were "not human," and he had not killed, because "I cannot kill."

Defendant did not retain any expert witness to testify in his behalf with respect to his defense of diminished capacity. He relied upon his own testimony and upon the cross-examination of the psychiatrists employed by the prosecution.

Two expert witnesses, Drs. Patterson and Von Dedenroth, testified for the prosecution. Dr. Patterson testified on direct examination that defendant had the capacity both to harbor malice aforethought and to premeditate the homicides.

During cross-examination defendant was permitted to bring out Dr. Patterson's opinion that defendant was suffering from a "mental defect" of a "paranoid" type on the basis of which the witness "did not believe that Mr. Yanikian could truly appreciate the nature and quality of his acts or the consequences thereof," and that the doctor's impression was that defendant "expected to be recognized as some type of hero for his actions." When, however, defense counsel attempted to ask Dr. Patterson concerning his opinion whether defendant was "either sane or insane," the court sustained an objection. Further questions as to other statements on legal sanity included in the three reports Dr. Patterson had submitted were effectively prevented by the court's ruling on defendant's offer to prove, through Dr. Patterson, in respect of defendant's mental defect that "the area of the defect would be in the area of not being able to know right from wrong in the commission of the offense." The court's ruling was that though he would permit evidence of "impairment of his mentality . . . going to show a diminished capacity," he would not permit "any evidence of straight insanity."

The effect of the above ruling was to preclude defendant from developing Patterson's impressions, stated in each of these three reports, which bore on the question of legal sanity under the *M'Naughton* rule.[2]

---

[2]Dr. Patterson's report of January 29, 1973, contained the following: "It would be my impression that his mental disorder is of such a degree that it forms the motivation for the offense of homicide and impairs his responsibility under M'Naughton."

In his report of March 20, 1973, Dr. Patterson expressed the opinion that there was no impairment of his capacity to premeditate. He added, "However, the motivation of the act did speak to his impairment under M'Naughton in that he was unable to appreciate the wrongfulness of the act."

In his report of March 26, 1973, Dr. Patterson stated: "I believe that out of his disordered thinking, he believes that he was justified in carrying out these acts, that he had a mission—so to speak—to commit these acts in order to 'shock' etc., and I do not believe that he considered he would be punished for these acts."

The prosecution also produced Dr. Thomas E. Von Dedenroth who gave psychiatric testimony to the effect that defendant was fully capable of both premeditation and malice aforethought. The cross-examination of Dr. Von Dedenroth developed the fact that he was of the opinion that defendant acted on the basis of a "misperception, a mistaken idea that normally would be clear to anyone else" that his acts of homicide "would benefit mankind" and on this basis the witness agreed that defendant did not consider them "simply bad acts." The cross-examination further developed that the doctor considered this a "paranoid reaction" but found no evidence of any disassociative reaction, since there was no indication of loss of understanding or of recall. Dr. Von Dedenroth stated his further opinion that the defendant was fully cognizant that he was killing "two fellow creatures" and not merely destroying two symbols of evil.

In view of the court's previously stated ruling that it would not permit inquiry into the issue of legal sanity or insanity, the defendant did not attempt to examine Dr. Von Dedenroth on this specific subject.

Two other matters occurred in the course of the trial which raised evidentiary questions. Defendant sought to verify the authenticity of his version of the massacres of Armenians by reading from Ambassador Henry Morgenthau's book on the subject. Defendant had already made references to reading the book and of acquiring from it some of his knowledge concerning the subject matter. When the prosecution objected to the reading of an excerpt, the court sustained the objection, on the ground that defendant would thereby be "getting this trial into a battle of history books on the cause of this controversy."

During cross-examination of defendant and in its rebuttal case the prosecution presented certain evidence suggesting sexual impropriety or prurient interest on the part of the defendant in connection with his publication of a collection of interviews with young people relating to their sex habits, entitled "Free Sexism," and an alleged attempt to seduce a cocktail waitress two nights previous to the homicides. The inference which might have been drawn from this evidence was that defendant's life was not entirely devoted to the high purposes which his direct testimony had suggested.

The prosecution also initiated an attempt to show, through an undercover policewoman, that a collateral purpose of defendant's interviews in the preparation of "Free Sexism" was to provide opportunities for attempted seduction. The court prevented this inquiry from proceeding to a point where the nature of the officer's testimony was apparent.

The trial court, at the request of both parties, instructed the jury fully on the issue of diminished capacity, including CALJIC instruction No. 8.77.[3] The court also gave CALJIC instruction No. 8.41 on voluntary manslaughter due to diminished capacity, No. 8.48 on involuntary manslaughter due to diminished capacity, and Nos. 8.30 and 8.31 on second degree murder. In addition, at the request of the prosecution, the court gave a special instruction which, though it cited section 1026 of the Penal Code, was in fact based on section 1016 of the Penal Code. This instruction read as follows: "The defendant is conclusively presumed to have been sane at the time the offenses are alleged to have been committed."

No instruction was given explaining the relationship between such special instruction and the instructions on diminished capacity nor was there any instruction defining "sane" as used in said instruction.

## Issues

The issues raised by this appeal are as follows:

1. Did the trial court properly exclude evidence on the issue of defendant's legal sanity?

2. Were the trial court's instructions on diminished capacity nullified by the special instruction that defendant was conclusively presumed sane?

3. Was the historical reference erroneously excluded?

4. Was defendant prejudiced by the reference to sexual matters?[4]

## Exclusion of Evidence of Legal Insanity

■ Defendant argues that though he designedly avoided pleading not guilty by reason of insanity, he should have been permitted to have in evidence Dr. Patterson's opinions, expressed in his written reports, casting doubt upon defendant's legal sanity under the *M'Naughton* rule because of his inability to appreciate the "wrongfulness" of his act. In his opening brief, defendant cites no authority in support of his position, and relies entirely upon an argument to the effect that "if insanity has any meaning at all, it would seem to include diminished capacity."

---

[3]The court struck from this instruction any reference to intoxication; otherwise, it was given without modification.

[4]Defendant has also asserted error on the basis of the fact the jury was not permitted to hear a tape-recorded interview between defendant and Dr. Patterson. Defendant has not given any citation to the transcript showing where said tape was offered in evidence by him, and it has not been marked as an exhibit. It is, therefore, impossible for this court to ascertain what relevance any matter contained in the tape might have had.

Despite the fact that the authorities supporting the trial court's ruling are cited in respondent's brief, defendant's reply brief states "appellant has been unable to find and thus offer case authority on the psychiatric issues."

The case authorities which are cited by the People are determinative. In *People* v. *Nicolaus,* 65 Cal.2d 866 [56 Cal.Rptr. 635, 423 P.2d 787], the defendant, during the guilt phase of the trial, sought to rely upon diminished capacity as a defense. To rebut the defense psychiatrists' testimony, the prosecution produced a Dr. Rapaport who testified defendant had the capacity to premeditate and had killed his children (whom he loved) thinking it "was the best for the children" because he "feared in their environment with their mother they would grow up like [her]" and they "were better off dead."

In cross-examination, defense counsel asked a question of Dr. Rapaport with results as follows: ". . . 'But if he believed that it was not evil, to that extent he didn't appreciate the distinction between right and wrong, did he?' The doctor stated, 'Well, I don't know whether you want to get into the issue of—' Here the court interposed the statement, 'We do not. The question is improper.' The trial court was correct. During the guilt phase of the trial the trial court should properly limit the medical testimony to the issue of mental capacity to commit murder in the first degree. Such rule is stated in *People* v. *Wells, supra,* 33 Cal.2d 330, at page 351 [202 P.2d 53]: 'Evidence which tends to show legal insanity (likewise, sanity) is not admissible at the first stage of the trial because it is not pertinent to any issue then being litigated; but competent evidence, other than proof of sanity or insanity, which tends to show that a (then presumed) legally sane defendant either did or did not in fact possess the required specific intent or motive is admissible.'" (65 Cal.2d at p. 881.)

There is no logical distinction between the guilt phase of a bifurcated trial where not guilty by reason of insanity is pleaded and a trial on a not guilty plea alone. In each case the law creates the conclusive presumption of legal sanity: in the first case, by section 1026 of the Penal Code; and in the latter case by section 1016.

Contrary to plaintiff's suggestion that legal logic cannot explain in any rational manner the rule excluding evidence of legal insanity in support of the defense of diminished capacity, such rule is entirely logical. If the issue is legal insanity of the defendant, the burden of proof is upon him to establish it by a preponderance of the evidence. (Evid. Code, §§ 522, 115.) When diminished capacity is the issue, the defendant need only create a reasonable doubt of his capacity to form the requisite intent to commit the

crime or degree of crime of which he is charged. Moreover, the consequences of defendant sustaining his position are entirely different. If he is found to be legally insane, he has no criminal responsibility whatever but he may be restrained indefinitely in an institution for the criminally insane. (Pen. Code, § 1026a.) If he is found to have diminished capacity, the seriousness of his offense may be diminished but he is not so institutionalized. In a case of this character, it would be virtually impossible meaningfully to instruct a jury on both of these confusingly similar defenses in respect of which not only the burden but the degree of proof is different and the consequences are widely divergent. The wisdom of the legislation which forecloses placing the jury in this untenable posture can scarcely be questioned.

## The Propriety of the Instructions

Substantially all of the court's instructions (a) defining the crimes of murder in the first and second degree, voluntary manslaughter and involuntary manslaughter, (b) defining the elements of "malice aforethought," "deliberate" and "premeditated," and (c) explaining diminished capacity in relation thereto were given as requested by both parties, and no question is raised as to their propriety. ■■■ Defendant urges, however, that the special instruction, to the effect that defendant was conclusively presumed to have been "sane," nullified the instructions on diminished capacity and confused the jury, in the absence of any explanation reconciling defendant's presumed sanity with the possible "mental illness" or "mental defect" referred to in the diminished capacity instructions.

Neither party has cited any authority bearing on this question. The only case which has come to the attention of this court is *People* v. *Williams,* 22 Cal.App.3d 34 [99 Cal.Rptr. 103]. In that case the defense of diminished capacity was based upon the claim that the defendant was undergoing a psychomotor epileptic attack which, as the court explained it, "would have made him legally insane as well as unconscious of his actions and diminished in capacity for the requisite specific intents." (P. 53.) Under these circumstances the giving of an instruction in substantially identical language as that given in this case, presuming the defendant to be "sane," was held erroneous. The trial court had also given CALJIC instruction No. 3.34 (not given in the case at bar) which was held to constitute "an affirmation by the trial court to be heeded by the jury that the defendant is of sound mind," (p. 51) thus greatly increasing the hazard that the jury would construe the word "sane" in the questioned special instruction as meaning "of sound mind," and have difficulty finding that he suffered from a "mental illness" or a "mental defect." In holding the instruction prejudicially

erroneous, the court said at pages 53-54: "The trial court after having given its instruction explaining the two phases of the trial and advising that defendant was to be conclusively presumed sane in the first, then should have defined insanity and clarified the duty and task of the jurors as to their dealings with the concepts of diminished capacity for specific intent and unconsciousness of actions. It is vital that a jury be instructed in clear and unambiguous terms. (*People* v. *Baker, supra,* at p. 570.) Absent such an instruction, the danger of equation of soundness or normality of mind with the sanity, which the jurors were told defendant was presumed to have, was present; we cannot be satisfied that such equation was not carried out. [Fn. omitted.]"

Though there was not nearly so much danger of equating soundness of mind with sanity under the instructions given by the trial court in this case, there was some danger of such interpretation. The jurors' understanding of the word "sane" may have coincided with the dictionary definition which is "mentally sound." (Webster's New Internat. Dict. (2d ed.) p. 2213.) If the word "sane" in the special instruction were so interpreted it would be in conflict with the diminished capacity instructions permitting findings of reduced mental capacity, "caused by mental illness, mental defect or any other cause."

Under the circumstances the special instruction should have included a caveat to the effect that the presumption of defendant's sanity did not preclude the jury from finding that defendant had substantially diminished capacity caused by mental illness or mental defect in accordance with the instructions on that subject. This would have been a better solution to the matter than attempting to define legal sanity in the context of the evidence in this case.[5]

It does not appear, however, that any error in this respect resulted in a miscarriage of justice.

The evidence bearing upon defendant's claim of diminished capacity was virtually uncontradicted, and it overwhelmingly demonstrated that defendant was not suffering from diminished capacity affecting either his ability to premeditate and deliberate or to harbor malice aforethought.

The essence of defendant's diminished capacity defense was stated by him in answer to a question put to him by his counsel. The question was: "Mr. Yanikian, did you kill two men in that room? A. I no kill anybody.

[5]See explanation, *infra,* of the inappropriateness of injecting the concept of rightness and wrongness into the consideration of diminished capacity under the facts of this case.

I destroy two evils for have symbol with which I want put light in the darkness that we can see what is going around. Why? For me they are not human. I take them from their nation. If I American sacrifice my life for mankind because I know if continue like this mankind would disappear same place when born."

Two concepts are included in this answer: (a) that as a result of the extreme trauma experienced in his youth and the frustration of his efforts to focus world attention upon the wrongs committed against the Armenian people, defendant considered himself justified in sacrificing both himself and the two representatives of the Turkish government, and (b) that his emotions in this respect so dominated and obscured his understanding that he saw them only as two symbols of evil and not as humans.

The first premise found ample support in all of the testimony from every source, including both psychiatrists produced by the prosecution. The belief on the part of defendant that his conduct was justified was, however, insufficient to constitute diminished capacity. The other premise that defendant did not see his victims as humans was totally without support in any credible testimony.

Defendant himself was the witness who most effectively destroyed the premise that he was unable to appreciate that his victims were humans. His testimony demonstrated that this premise was an afterthought conceived subsequent to his commission of the homicides in an attempt to escape responsibility for them. In his testimony respecting his planning of the homicides defendant was asked if "the initial thinking for the killing of two men" commenced in April 1972. Defendant responded as follows: "Mr. Lindsey, you defend me—thank you very much. You are doing very good job. I am sorry—remember, I ask you never use this word 'killing.' Despite the fact I did, please."

Later, in relating his conversation with the victims, immediately prior to the homicides, defendant testified that he said to them: "Now I will destroy you. I will kill you." And, shortly thereafter, describing his administration of a *coup de grace* to each of the two victims as they lay face down on the floor, defendant's testimony was: "I saw two body on the floor, I went put back this gun, I take other gun, small Browning, and approach. They lie down, and I shoot them two bullets each head. What I did this? I don't want they suffer. I don't want they no suffer. They did their job for their nation. They did job for mankind. I no want they suffer more."

Finally on the succeeding page of the transcript defendant related his

immediately following conversation with the hotel telephone operator whom he asked to call the sheriff, and he testified in this respect: "I think I told, 'I killed two men in my room.'"

Defendant's own testimony thus clearly showed that he fully understood at the time that his victims were human beings who would suffer and die, even though he also saw them as symbols of an evil government.

Defendant's testimony in this respect is entirely consistent with that of several other witnesses who had occasion to discuss the homicides with him on the day they were committed. The testimony of each of these witnesses as to what he said stood totally uncontradicted by defendant, and each of them consistently reported that defendant calmly and logically told them that he had killed two men in his hotel room.

The only conclusion the jury could validly reach on the basis of this testimony was that defendant understood he was taking the lives of two human beings and that he did so because he considered it justified, in the same fashion in which his own personal "sacrifice" was justified. This left the jury no foundation upon which to find defendant was suffering from diminished capacity. His ability to deliberate and to premeditate his crime was demonstrated by his own testimony of the elaborate preparations pursuant to a plan which was executed with logic and precision. Defendant's testimony showed the plan was initiated many months prior to its execution and involved the use of a bait to lure the consular officials to the place chosen by defendant.

Defendant's malice aforethought was equally manifest. It was questioned solely on the basis of defendant's belief in the moral justification of his act. Such, however, is not a valid basis to question the existence of malice aforethought.

■ The relationship between malice aforethought and diminished capacity is clearly and authoritatively explained by Justice Traynor in *People v. Conley*, 64 Cal.2d 310, 322 [49 Cal.Rptr. 815, 411 P.2d 911], as follows: "A person capable of achieving such a mental state [premeditation] is normally capable also of comprehending the duty society places on all persons to act within the law. If, despite such awareness, he does an act that is likely to cause serious injury or death to another, he exhibits that wanton disregard for human life or antisocial motivation that constitutes malice aforethought.

■ "An intentional act that is highly dangerous to human life, *done in disregard of the actor's awareness that society requires him to conform his*

*conduct to the law, is done with malice regardless of the fact that the actor acts without ill will toward his victim or believes that his conduct is justified.* In this respect it is immaterial that he does not know that his specific conduct is unlawful, for all persons are presumed to know the law including that which prohibits causing injury or death to another. An awareness of the obligation to act within the general body of laws regulating society, however, is included in the statutory definition of implied malice in terms of an abandoned and malignant heart and in the definition of express malice as the deliberate intention unlawfully to take life.

"Thus, one who commits euthanasia bears no ill will toward his victim and believes his act is morally justified, but he nonetheless acts with malice if he is able to comprehend that society prohibits his act regardless of his personal belief." (Italics added.)

 The application of this standard to the defendant's conduct in this case is clear. So long as defendant understood that homicide was conduct society did not expect of him, it is immaterial that he may have committed these particular homicides, with the highest of motives firmly believing he was justified in doing so.

The decision of the Supreme Court in *People* v. *Sirhan* (1972) 7 Cal.3d 710 [102 Cal.Rptr. 385, 497 P.2d 1121], in which the facts are strikingly similar to those with which we are dealing here, is an application of the same principle. In that case the court described the testimony of the prosecution's own psychiatrist as follows: ". . . In a report to the district attorney Dr. Pollack stated, 'Sirhan's mental illness was related to his act of assassination in that his paranoid convictions went beyond those of a normal personality in the average citizen . . . . This mental illness should be considered a substantial mitigating factor on the issue of penalty. . . .'

"Dr. Pollack also testified that defendant believed it was 'good' and 'right' to kill Senator Kennedy and had that belief when he made the entries in his notebooks. Defense counsel then asked, 'As a matter of fact, he felt it was his duty almost to do it, didn't he?', and Dr. Pollack replied, 'Almost, yes. As an Arab he felt that it was his duty, that he would be looked up to by the Arab world and that he would be considered a hero.' . . . Dr. Pollack further testified that defendant did not expect to be punished for his act because in his view Kennedy and others having the senator's views about the Arab-Israel conflict were murderers." (7 Cal.3d at pp. 725-726.)

Yet Sirhan was held properly to have been found guilty of murder in the first degree.

Such application of the rule in *Conley, supra,* to the criminal conduct

of fanatics is highly appropriate. Fanatics of all types, religious, racial and political, abound in the world today. Typically their conduct is characterized by some degree of mental illness by virtue of which they place some purpose or principle above the law and thereby justify disregard of the law. Repudiation of any such basis for excusing or extenuating crime is indispensable to the continuance of organized society under law.

The evidence overwhelmingly showed that defendant (despite his belief that his conduct was justified) understood that society expected him not to commit homicide. This evidence, which was likewise without conflict, consisted of his own testimony relating to putting his affairs in order in the expectation that he would have a long stay in custody, his press release disclosing his intent that he be arrested and tried, and his statements to the hotel employees upon reporting the homicide to the effect they should arrange to have his bill sent to the jail.[6]

In light of the foregoing, it is clear that even if the jury had been properly instructed, it could not have reached any other verdict than that defendant was guilty of premeditated murder. The error, if any, in the instruction, therefore, did not result in a miscarriage of justice and the judgment should not be reversed on that ground. (See Cal. Const., art. VI, § 13.)

### The Exclusion of the Historical References

The court's ruling, which excluded from evidence some 150 pages of Ambassador Morgenthau's historical work on the subject of the Armenian massacres, was not erroneous. It would have been wholly inappropriate to immerse the jury in a contest over the veracity of the various versions of these historical events. Defendant had already testified to what he had read in this reference which had influenced him, and it was his belief, not the facts, which was relevant. There was no error in this respect.

### The Reference to Sexual Matters

The attempts of the prosecution to cast aspersions upon defendant's character in relation to his personal sexual morality were hardly commend-

---

[6]The testimony of Dr. Patterson to the effect that defendant did not "truly appreciate the nature and quality of his acts or the consequences thereof" does not detract from the effect of the above evidence. As defined in Webster's New International Dictionary (2d ed.) at page 2724, "truly" means "exactly" and "accurately," and "appreciate" means "appraise." To say of defendant that he did not accurately appraise the nature and quality of his acts or the consequences thereof to the point of exactitude (which few of us ever do) in no way suggests that he was not aware that society required him to conform his conduct to law.

able. They were brought on, no doubt, by defendant's extensive excursion into his own great personal contributions to the entertainment, enlightenment and well-being of humanity. These matters do not, however, rise to any substantial violation of defendant's rights. The inquiry into his publication "Free Sexism" was conducted without any objection on defendant's part as was the cross-examination of defendant with respect to the alleged attempt to seduce a cocktail waitress a short time before the homicides occurred. The subsequent attempt to elicit testimony of improper advances to a policewoman, who called upon defendant in the course of undercover activities in relation to his publication "Free Sexism," was stopped by the court before the nature of defendant's alleged conduct in respect of the policewoman was in any respect disclosed to the jury. No misconduct which would justify disturbing the jury verdict occurred in this connection.

The judgment is affirmed.

Cobey, Acting P. J., and Allport, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 17, 1974.