[Crim. No. 12889. Fourth Dist., Div. Three. Mar. 30, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD BUD SPRING, Defendant and Appellant.

1200

COUNSEL

James R. Goff, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, John W. Carney and Yvonne H. Behart, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CROSBY, J.**—Ronald Spring was charged by information with an odd combination of offenses, murder and malicious mischief (Pen. Code, §§ 187 and 594, subd. (a)). His motion for entry of judgment of acquittal was denied, except on the first degree murder charge (Pen. Code, § 1118.1), and the jury found him guilty of murder in the second degree and malicious mischief.

We must resolve three questions: (1) Was the evidence sufficient to sustain a second degree murder conviction? (2) Did the court err in permitting extended media coverage of the trial? (3) Was Spring's counsel guilty of a variety of alleged instances of ineffective representation?

We hold the evidence was insufficient to support a murder conviction and, pursuant to Penal Code section 1181, subdivision 6, modify the judgment to involuntary manslaughter (Pen. Code, § 192, subd. 2).[1] But we find no error in the allowance of extended media coverage and no merit in those claims of ineffective assistance of counsel not already mooted by the reduction of the murder conviction to manslaughter.

I

Spring, 35, suffered from the delusion a woman named Twilla Suggs, whom he barely knew some 19 years ago, was confined in a convent but would marry him if he could obtain her release. Over the years he apparently made numerous contacts with churches and convents attempting to locate Suggs. In the afternoon on February 9, 1980, Spring drove his motorcycle to two Catholic churches, St. Bartholomew's in Long Beach, Los Angeles County and St. Ann's in Seal Beach, Orange County. At St. Ann's he walked to the back door of the rectory and told the housekeeper he wished to speak to the priest about arranging a wedding ceremony. When Father Felix Doherty, 64, came to the door, Spring asked how he could locate Suggs. Doherty responded by telling him to go to the front door.

---

[1]This modification makes unnecessary determination of other defense contentions that prejudicial evidence was improperly admitted to show malice and the court gave certain erroneous jury instructions relating to the murder charge.

Spring felt Doherty was being uncooperative and should have invited him into the rectory, if he were going to help him. "[W]ith that thought in mind," Spring tried to push Doherty out of the doorway and enter the rectory. Doherty raised his arms to stop Spring, touching him in the process. "[I]n the shock of the moment," Spring swung his right arm and punched Doherty above the left eye. After throwing the one punch, Spring left. Passing a witness he said, "You didn't see that."

The force of the punch caused Doherty to step back a few feet, but it was not strong enough to cause him to fall down or lose consciousness. Firemen treated Doherty briefly for an abrasion the size of a dime and for swelling from the eyebrow to the hairline, and a call for paramedics was cancelled. Police listed the incident as a misdemeanor assault and battery (Pen. Code, §§ 240, 242). Tragically, one week later Doherty collapsed and lapsed into a coma. He died 17 days after the encounter from a subdural hematoma caused by the single punch.

The prosecution presented evidence that Spring had been at St. Ann's before this incident, and Spring described his prior relationship with Doherty as being "very good." He said Doherty had provided him money for food on occasion. There was no evidence Spring ever threatened Doherty or argued with him before February 9. Additionally, two witnesses confirmed Spring had not threatened Doherty prior to throwing the punch, and one witness confirmed Doherty touched Spring while trying to stop him from entering the rectory.

The prosecution presented considerable evidence of Spring's hostility to the Catholic Church, however. On February 5, 1980, an intoxicated Spring made several calls to the Chicago Archdiocese communication's director, Peter Foote, seeking Suggs' location and demanding her release. Spring's language was obscene and abusive, his thoughts incoherent; and he threatened Foote. Additionally, a postarrest search of Spring's apartment yielded a paper containing the archdiocese's telephone number, Foote's name, and the words "Blood" and "Dead." The malicious mischief charge arose from an incident at St. Bartholomew's Church the same afternoon Spring attacked Father Doherty. There he broke the porch light when told no priest was then available and an appointment was required to arrange a wedding.

A tape of a telephone conversation between Spring and a district attorney's investigator was played for the jury. In that conversation the investigator claimed to be a witness to the assault and sought money from Spring for not going to the police. At first Spring sounded interested but then told him to talk to the officer investigating the incident. When the investigator told Spring Doherty had died, Spring stated he was sorry. After this con-

versation Spring left his apartment and took a walk. His actions indicated he was checking to see if he was under surveillance, which he was.

A prisoner serving a two-year concurrent sentence for burglary and assault on a police officer testified Spring admitted to hitting the priest and said, "Dead men can't talk." Spring did not indicate whether he thought Doherty's testimony would help or harm him.

## II

■ In determining whether there is sufficient evidence as a matter of law to support a second degree murder conviction, "every relevant and tenable presumption is to be indulged in favor of sustaining the judgment of the trial court; but when a proper case appears (Pen. Code, § 1181, subd. 6) [the court should] modify the judgment . . . ." (*People* v. *Wolff* (1964) 61 Cal.2d 795, 818-819 [40 Cal.Rptr. 271, 394 P.2d 959]; *People* v. *Cruz* (1980) 26 Cal.3d 233, 242 [162 Cal.Rptr. 1, 605 P.2d 830].)

■ Murder is "the unlawful killing of a human being . . . with malice aforethought" (Pen. Code, § 187), while manslaughter is a killing without malice (Pen. Code, § 192). "When a defendant ' "with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death," ' he acts with malice aforethought. [Citations.]" (*People* v. *Conley* (1966) 64 Cal.2d 310, 321 [49 Cal.Rptr. 815, 411 P.2d 911].) Malice aforethought neither presupposes nor requires any ill will or hatred of a particular victim. (*Id.,* at p. 322.) Manslaughter is voluntary when it occurs "upon a sudden quarrel or heat of passion" (Pen. Code, § 192, subd. 1) and involuntary when it occurs "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection . . . ." (Pen. Code, § 192, subd. 2.)

In the early case of *People* v. *Munn* (1884) 65 Cal. 211 [3 P. 650], our Supreme Court reversed a similar murder conviction where the accused struck another bar patron several times. The court observed, "It does not appear from the evidence in this case that there was any intention on the part of the defendant to kill the deceased, and the physician who made the *post mortem* examination states that an ordinary blow would not have produced the fracture which resulted in the death of [the victim]. It appears, too, that the blow happened by chance to fall upon that portion of the skull which is the thinnest and most easily fractured. There certainly was no design or intent on the part of the defendant that it should. If the blow had fallen a little higher or a little lower on the skull, the result, in all human probability, would not have been fatal. If death had not ensued the defendant

would have been guilty of a simple assault and battery under the Penal Code, as the assault was not with a dangerous weapon or instrument, or by any means or force likely to produce great bodily injury." (*Id.*, at p. 214.)

A more modern expression of the same notion goes as follows: "Normally, hitting a person with the hands or feet does not constitute murder in any degree. [Citations.] But if death or great bodily harm is a reasonable or probable consequence of the beating the offense may be murder. [Citation.] Thus, to constitute murder there has to be either an intent to kill or such wanton and brutal use of the hands without provocation as to indicate that they would cause death or serious bodily injury so as to indicate an abandoned and malignant heart." (*People* v. *Teixeira* (1955) 136 Cal.App.2d 136, 150 [288 P.2d 535].)

Each case the Attorney General urges in support of the judgment, with one distinguishable exception, involved a far more severe battery than Spring's one punch. Thus, in *People* v. *Beyea* (1974) 38 Cal.App.3d 176 [113 Cal.Rptr. 254] and *People* v. *Cayer* (1951) 102 Cal.App.2d 643 [228 P.2d 70], two men beat one victim. In *People* v. *Gaulden* (1974) 36 Cal.App.3d 942 [111 Cal.Rptr. 803], the defendant stabbed his victim in the lung with a knife; and in *People* v. *Tubby* (1949) 34 Cal.2d 72 [207 P.2d 51], the defendant struck his victim with his fist, dragged him into their house and continued beating him.

In *People* v. *Zankich* (1961) 189 Cal.App.2d 54 [11 Cal.Rptr. 115], the defendant apparently struck his victim only once; but this case is poor authority for two reasons. First, the attack was on a stranger, an elderly bar patron, and without provocation; and evidence was received of another, very vicious, unprovoked assault by the defendant on a different bar patron the previous evening to demonstrate his "abandoned and malignant heart." Second, the conviction in that case was premised before the jury and on appeal on the now discredited felony murder theory of a homicide occurring in the course of a felonious assault by means of force likely to cause great bodily injury (Pen. Code, § 245). (See *People* v. *Ireland* (1969) 70 Cal.2d 522, 539-540 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].)

Here, Spring threw but one punch and turned on his heel and left. Unlike the single blow in *Zankich,* the blow to Doherty was too weak to knock him off his feet or render him unconscious (or even result in a felony filing before Father Doherty's death).[2] Thus, it was not an act involving "a high degree of *probability* that it [would] result in death." (*People* v. *Con-*

---

[2]The Attorney General also makes the argument Spring's attire somehow demonstrates malice. When he struck Father Doherty, Spring was wearing his motorcycle garb: helmet, gloves, and jacket. Since he had just arrived at St. Ann's on a motorcycle, these facts prove little, if anything.

*ley, supra,* 64 Cal.2d 310, 321, italics added.) Moreover, however minimal, there was *some* provocation here. The priest apparently did attempt to physically bar Spring's entry; and, given Spring's bizarre delusional state, it cannot be said his spontaneous striking out sprang from an abandoned and malignant heart as opposed to an irrational frustration stemming from the quixotic pursuit of the elusive Ms. Suggs.

Nor can we, without more, transmute Spring's hostility toward the church into malice aforethought in the striking of Father Doherty. ■ The appropriate test to evaluate acts flowing from abnormal or irrational thought processes is stated in *People* v. *Conley, supra,* 64 Cal.2d 310: "An intentional act that is *highly dangerous to human life,* done in disregard of the actor's awareness that society requires him to conform his conduct to the law, is done with malice regardless of the fact that the actor acts without ill will toward his victim or believes that his conduct is justified." (*Id.,* at p. 322, italics added.) As one court aptly noted, "Such application of the rule in *Conley, supra,* to the criminal conduct of fanatics is highly appropriate. Fanatics of all types, religious, racial and political, abound in the world today. Typically their conduct is characterized by some degree of mental illness by virtue of which they place some purpose or principle above the law and thereby justify disregard of the law." (*People* v. *Yanikian* (1974) 39 Cal.App.3d 366, 380-381 [114 Cal.Rptr. 188]; see also *People* v. *Sirhan* (1972) 7 Cal.3d 710, 725-726 [102 Cal.Rptr. 385, 497 P.2d 1121], cert. den. *sub nom., Sirhan* v. *California* (1973) 410 U.S. 947 [35 L.Ed.2d 613, 93 S.Ct. 1382], overruled in part on other grounds, *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584, 593, fn. 7 [150 Cal.Rptr. 435, 586 P.2d 916].) ■ Both *Yanikian* and *Sirhan* involved deliberate killings with firearms; they easily met the "highly dangerous to human life" element of the *Conley* test.

This case simply does not. To repeat, Spring's assault consisted of but a single punch and was not even of sufficient force to knock down an elderly man or cause more than slight outward damage.

That Spring threatened another churchman and wrote the words "Blood" and "Dead" four days before the incident and said "Dead men can't talk" after his arrest is all there is to support the theory he contemplated anything more than the simple battery originally charged—if that—against Father Doherty. Although a defendant's attitude toward the deceased (or, we suppose, the institution he represents) is relevant "in some degree to show malice and motive" (*People* v. *Barthleman* (1898) 120 Cal. 7, 14 [52

P. 112]), actions speak louder than words; and Spring's actions were simply not those of one embarked on a murderous attack. For these reasons the conviction must be reduced to involuntary manslaughter (Pen. Code, § 192, subd. 2).[3]

## III

Spring asserts the intrusion of television cameras into the courtroom violated his Sixth Amendment right to a fair trial and the California Rules of Court because the request for extended media coverage did not precede jury voir dire. The California Rules of Court specify requests for television coverage shall be made "a reasonable time in advance of the commencement" of coverage (rule 980.2(e)(1)) and provide the court in its discretion may allow or refuse the request (rule 980.2(f)(1)) and may decide "any issue that is not covered by these rules" (rule 980.2(k)(1)). The rules do not expressly state requests must precede commencement of trial, although in fairness to the parties this should be the usual practice. The rules are perforce flexible, since an occurrence in the trial itself might trigger the public's interest. Although this was not apparently the case here, the defense could not have been surprised by the request; and we find no abuse of discretion for that reason.

The record indicates prior to jury voir dire defense counsel stated, "it is certainly my educated guess that [the trial] will generate some publicity." He obviously would have been permitted reasonable latitude on voir dire on the matter, for the court itself noted the possibility part of the trial would be televised and asked the prospective jurors if their concentration would be affected by the cameras. Although voir dire continued after this comment, defense counsel chose not to examine on the subject. Thus, he did anticipate, or should have, the television station's request.

Spring's Sixth Amendment argument is similarly meritless. "To demonstrate prejudice in a specific case a defendant must show something more than juror awareness that the trial is such as to attract the attention of broadcasters. [Citation.] No doubt the very presence of a camera in the courtroom made the jurors aware that the trial was thought to be of sufficient interest to the public to warrant coverage. . . . But the [defendant has] not attempted to show with any specificity that the presence of cameras impaired

---

[3]Voluntary manslaughter is an intentional killing and thus inapplicable.

the ability of the jurors to decide the case on only the evidence before them or that [his] trial was affected adversely by the impact on any of the participants of the presence of cameras and the prospect of broadcast." (*Chandler* v. *Florida* (1981) 449 U.S. 560, 581 [66 L.Ed.2d 740, 756, 101 S.Ct. 802].)

## IV

Appellate counsel accuses trial counsel of a series of blunders which allegedly amount to ineffective assistance of counsel. (*People* v. *Fosselman* (1983) 33 Cal.3d 572 [189 Cal.Rptr. 855, 659 P.2d 1144]; *People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Several arguments relate only to the murder charge and are mooted by our reduction of the conviction to involuntary manslaughter. In this category are the failure to seek a limiting instruction concerning the Chicago phone calls, the failure to object to certain murder instructions (CALJIC Nos. 8.31 and 8.48), and the decision not to present a defense of diminished capacity.[4]

 Finally, it is claimed trial counsel failed to adequately investigate a possible discriminatory prosecution defense on the theory Spring was only prosecuted for murder on these facts because the victim was a Catholic priest (see *Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286 [124 Cal.Rptr. 204, 540 P.2d 44]), although he suggested that idea in argument to the jury. Even if the contention had the slightest merit, which it does not, our opinion has cured any harm in the overcharging. Moreover, the suggestion that defendants found to be on the higher end of the prosecutorial charging scale, after a proportionality review of other similar offenses, should obtain dismissals under *Murgia* simply because the prosecutor appears to have been influenced by the status of the victim is wholly without legal or logical support.[5]

---

[4]Neither lawyer noted, apparently, the lack of jurisdiction to try the St. Bartholomew's, Los Angeles County, malicious mischief charge in Orange County. Also neither has questioned the apparent misjoinder of these offenses, which are not of the same class of crimes or connected in their commission (Pen. Code, § 954). Although the St. Bartholomew's evidence had as much relevance as the Chicago phone calls, it too would have been subject to a similar limiting instruction if appellate counsel's argument is correct, a question we need not address.

Since the defense has yet to object to the trial or conviction of the Penal Code section 594, subdivision (a) charge, we do not consider the question. (Pen. Code, § 1462.2.)

[5]The same trial lawyer was subjected to a similar desperation denouncement in *People* v. *Eckstrom* (1974) 43 Cal.App.3d 996 [118 Cal.Rptr. 391]. Defenders of unpopular criminal causes need thicker skins than ever before in the post *Pope* era. Often the only person in counsel's corner is the client, and now *he* must be expected to mount a vicious *après* trial attack on his professional competency via his new appellate counsel. And appellate counsel, similarly vulnerable, has little choice in the matter.

The judgment is affirmed on count one, as reduced to involuntary manslaughter (Pen. Code, § 192, subd. 2), and remanded for resentencing accordingly.

Trotter, P. J., and Wallin, J., concurred.