[No. E038509. Fourth Dist., Div. Two. Mar. 8, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES HOWARD DIXON, Defendant and Appellant.

COUNSEL

Chris Truax, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Bradley A. Weinreb and Ronald A. Jakob, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

McKINSTER, J.—

## 1. Introduction

A jury found defendant James Howard Dixon to be a sexually violent predator and the trial court recommitted defendant to a secured facility under the Sexually Violent Predators Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.). Defendant appeals the judgment and raises two claims of error. Defendant claims the court erred in granting the media's request to televise or videotape the proceedings. Defendant also claims the court erred in failing to order the prosecutor to disclose the victims' contact information.

In addressing defendant's first claim, we explain that while the public and the press may have a First Amendment right to attend the proceedings, the press does not have a constitutional right to have a camera in the courtroom. The trial court erred in failing to apply the proper standard in evaluating the media's request to televise the proceedings and, specifically, in failing to give adequate consideration to the factors listed in California Rules of Court, rule 1.150 (formerly rule 980).[1] The error, however, is harmless because defendant cannot show that the media's intrusion affected the jury's determination that he satisfied the criteria for recommitment.

As to defendant's second claim, we recognize that, as a special proceeding of a civil nature, a civil commitment proceeding under the SVPA must apply the rules set forth in the former Civil Discovery Act of 1986 (Code Civ. Proc., former § 2016 et seq.) (hereafter Civil Discovery Act or the Act.) We nevertheless conclude that, while defendant was entitled to the victims'

---

[1] Effective January 1, 2007, the California Rules of Court were reorganized and renumbered. All further references to a specified numbered rule are to the current California Rules of Court unless otherwise stated.

contact information under the Civil Discovery Act, he failed to make a timely demand as required under the Act.

We affirm the judgment.

## 2. Factual and Procedural History

In 1978 and 1987, defendant was convicted of various violent sex crimes against three separate victims. The 1978 incidents occurred in San Diego. While 15-year-old Joy P. was babysitting, defendant approached the house and insisted that he be allowed inside to retrieve something. After arguing with defendant for several minutes, Joy allowed defendant into the house. Inside, defendant put his hand over Joy's mouth and pointed what appeared to be a knife against her back. Defendant ordered Joy into the bedroom, where he forced her to orally copulate him and then raped her. After defendant forced her to orally copulate him a second time, Joy was able to slip out the front door and run to her parents' house next door.

A few days later, defendant also assaulted 30-year-old Crystal M., who was working as a cab driver. After having Crystal drive around, he placed a metal comb against her throat and demanded sex. In addition to raping Crystal, defendant beat her on the head with objects from the cab, including the meter flag. Afterwards defendant left Crystal on the street, bloody and barely conscious.

The 1987 incident occurred in Riverside. While Jane D. was asleep in her apartment, defendant came into her bedroom and pinned her down by the shoulders. Defendant hit Jane about a dozen times across her face and choked her with his hand. During the course of the night, defendant repeatedly attempted to penetrate Jane's vagina and anus with his penis. When defendant fell asleep, Jane got away and went for help. The officers found defendant asleep on Jane's bed. When they attempted to arrest him, he broke free and punched one of the officers. Only after a violent struggle were the officers able to handcuff defendant and place him under arrest.

Defendant pled guilty to the crimes. He initially served his sentence in state mental hospitals, but, after his treatment proved ineffective, he was sent to prison.

On August 2, 2000, a jury found that defendant was a sexually violent predator within the meaning of Welfare and Institutions Code section 6600 et seq. The trial court placed defendant in the custody of the Department of Mental Health.

On June 20, 2002, the Riverside County District Attorney filed a petition for subsequent commitment under Welfare and Institutions Code section 6604 et seq. On July 20, 2004, the district attorney filed another petition for subsequent commitment. The trial court consolidated both petitions for trial.

During the trial, the prosecutor presented the testimony of Dr. Shoba Sreenivasan, a licensed psychologist, and Dr. Gabrielle Paladino, defendant's treating psychiatrist at Atascadero State Hospital. Both psychological experts diagnosed defendant with paraphilia, alcohol dependency, and antisocial personality disorder. Both experts also concluded that defendant was a sexually violent predator and was likely to reoffend.

Defendant admitted only that he had problems with anger and alcohol. Defendant claims that he has resolved these problems by taking anger management classes and receiving treatment for alcohol dependence. Defendant's expert, Dr. Mary Jane Alumbaugh, testified that defendant was not likely to reoffend because he was now 48 years old.

During the trial, Joy, Jane, and the police officers who responded to Jane's apartment testified that defendant did not manifest any signs of being under the influence of alcohol.

The jury found defendant to be a sexually violent predator who remains a danger to others within the meaning of Welfare and Institutions Code section 6600. The trial court ordered defendant to be recommitted to the Department of Mental Health for further treatment in a secured facility.

### 3. Press Coverage

The question we address in this opinion is whether the trial court properly exercised its discretion in allowing the media to videotape a civil commitment proceeding under SVPA.

Before the trial, defendant filed motions for a change of venue and for orders to seal the record, close the proceedings, and prohibit television coverage of his trial. The case had drawn substantial media attention, and reporters from both CBS 2 and The Press-Enterprise were contacting counsel for interviews. On June 8, 2005, defendant's counsel was informed that the media had sought to televise defendant's trial. In her arguments in support of the defense motions, defendant's counsel argued that, based on the highly sensitive nature of the proceedings and the public prejudice against sex offenders, any additional and unnecessary media attention would prevent defendant from receiving a fair trial. Counsel specifically argued that defendant's psychological records were confidential under Welfare and Institutions

Code section 5327 and any use of these records during the civil commitment proceedings should not allow for the dissemination of defendant's personal information to the public. Counsel also argued that televising the proceedings would intimidate defense witnesses from testifying, thereby making it impossible to present a defense.

The court held a hearing on defendant's motions on June 9, 2005. David Wohl of CBS 2 and counsel for The Press-Enterprise attended the hearing. Defendant's attorney initially remarked that the media's request to televise the proceedings was untimely. Defendant's counsel also discussed the arguments presented in her moving papers, mentioning specifically the confidentiality of defendant's mental health records and the effect of the anticipated media attention on defendant's ability to have an impartial jury and procure witnesses for his defense. Both Wohl and counsel for The Press-Enterprise argued for the public's First Amendment right to have access to both criminal and civil trials. Defendant's attorney responded that involuntary civil commitment proceedings, such as proceedings under the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.), are typically closed and confidential. Counsel explained that courts have found that civil commitment proceedings under the SVPA are not intended to be punitive in nature, but instead, are designed to determine the defendant's need for hospitalization.

The trial court denied defendant's motion. On the question of whether to allow a camera in the courtroom, the court concluded that, despite the concerns raised by defendant, there were less restrictive alternatives to denying such coverage. The court instructed Wohl to position his camera so that it would not be a distraction. The court also indicated that it would protect the identity of the jurors and, where necessary, the defense witnesses.

Although the trial court's approach appears to be reasonable, it is apparent upon closer examination that the court failed to give proper consideration to the factors listed in rule 1.150. As will be discussed below, when confronted with the precise issue involved in this case, the federal courts have held that the public and the press do not have a constitutional right to broadcast or videotape court proceedings. California law specifically prohibits the broadcasting of court proceedings, unless the court reasonably exercises its discretion by applying a certain set of factors. The record shows that the court failed to give proper consideration to these factors.

A. *The Press and Civil Commitment Proceedings*

We begin our analysis with the broader question of whether the press should have access to a civil commitment proceeding under the SVPA. Although this is not the precise issue in this case, this is the question that

preoccupied much of the hearing below and the briefs on appeal. A discussion of this question also will provide the necessary background for addressing the propriety of television coverage in a proceeding under the SVPA.

■ Both the federal and state courts acknowledge a presumption in favor of public access. Under the First Amendment made applicable to the states by the Fourteenth Amendment, the public has a right to attend both criminal and civil proceedings. (See *Press-Enterprise Co. v. Superior Court* (1986) 478 U.S. 1 [92 L.Ed.2d 1, 106 S.Ct. 2735]; *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1210 [86 Cal.Rptr.2d 778, 980 P.2d 337] (hereafter *NBC Subsidiary*).) The press does not have a special right to access, but instead enjoys the same right afforded to the rest of the public. (*Branzburg v. Hayes* (1972) 408 U.S. 665, 684 [33 L.Ed.2d 626, 92 S.Ct. 2646].)

The California Supreme Court, after reviewing cases upholding the public's constitutional right to attend criminal trials, specifically held that the public also has a right to attend civil trials. (*NBC Subsidiary, supra*, 20 Cal.4th at p. 1209, citing *Richmond Newspapers, Inc. v. Virginia* (1980) 448 U.S. 555, 580 & fn. 17 [65 L.Ed.2d 973, 100 S.Ct. 2814] (hereafter *Richmond Newspapers*).) Because the public has a First Amendment right to access, the party seeking closure must offer a compelling interest that cannot be achieved through less restrictive means. (See *NBC Subsidiary, supra*, 20 Cal.4th at p. 1203, citing *Globe Newspaper Co. v. Superior Court* (1982) 457 U.S. 596, 607 [73 L.Ed.2d 248, 102 S.Ct. 2613].) Based on this constitutional right to access, courts have strongly disfavored legislation or judicial orders mandating the closure of courtrooms, even where the state has a legitimate interest in ensuring privacy. (*NBC Subsidiary, supra*, 20 Cal.4th at pp. 1199–1203, citing *Richmond Newspapers, supra*, 448 U.S. 555 [holding unconstitutional a court's mandatory closure order in a high profile murder trial, despite two prior mistrials] & *Globe Newspaper, supra*, 457 U.S. 596 [finding unconstitutional a state statute mandating closure during the testimony of minor victims of sex crimes].)

Closed proceedings or partial closures, however, may be allowed upon a showing that press coverage would cause prejudice based on the specific facts in the case. (*NBC Subsidiary, supra*, 20 Cal.4th at p. 1211.) The public's right to access, therefore, is not absolute. (See *Richmond Newspapers, supra*, 448 U.S. at p. 581, fn. 18.) "[I]n neither the criminal nor the civil context do the high court cases or their progeny described above grant an 'unrestricted' right of access; each decision has been careful to explain that, under certain circumstances, the presumption of openness can be overcome upon a proper showing." (*NBC Subsidiary, supra*, 20 Cal.4th at p. 1211.)

Thus, despite the presumption in favor of open proceedings, courts have upheld exclusion orders to ensure a fair trial under certain circumstances. (Compare *Gannett Co. v. DePasquale* (1979) 443 U.S. 368, 388, fn. 19 [61 L.Ed.2d 608, 99 S.Ct. 2898] [excluding the public from pretrial suppression hearing in a criminal case] & *Branzburg v. Hayes, supra,* 408 U.S. at p. 684 [excluding the press from attending grand jury proceedings which are designed to determine whether probable cause exists to prosecute the accused] with *Press-Enterprise Co. v. Superior Court of Cal.* (1984) 464 U.S. 501, 513 [78 L.Ed.2d 629, 104 S.Ct. 819] (*Press-Enterprise I*) [upholding the public's right to attend jury voir dire] & *Press-Enterprise Co. v. Superior Court, supra,* 478 U.S. at p. 13 (*Press-Enterprise II*) [extending the public's right to access to preliminary hearings].) While these decisions generally are made on a case-by-case basis by weighing the parties' rights to privacy or fairness on the one hand with the public's right to access on the other, the courts have not foreclosed the possibility of legislation requiring closed proceedings in certain special cases. "We observe that various statutes set out, for example, in the Code of Civil Procedure, Family Code, and Welfare and Institutions Code provide for closure of certain civil proceedings. We address herein the right of access to ordinary civil proceedings in general, and not any right of access to particular proceedings governed by specific statutes." (*NBC Subsidiary, supra,* 20 Cal.4th at p. 1212, fn. 30; see also *In re Marriage of Burkle* (2006) 135 Cal.App.4th 1045, 1058, fn. 17 [37 Cal.Rptr.3d 805].)

█ In determining whether the constitutional right of access attaches to a particular proceeding, the United States Supreme Court has set forth two related considerations: first, whether the place and process historically have been open to the public and, second, whether public access plays a significant positive role in the particular process. (*Press-Enterprise II, supra,* 478 U.S. at p. 8.) "Although many governmental processes operate best under public scrutiny, it takes little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly." (*Id.* at pp. 8–9.)

For example, the public does not have a First Amendment right to attend juvenile dependency proceedings. (*San Bernardino County Dept. of Public Social Services v. Superior Court* (1991) 232 Cal.App.3d 188, 195 [283 Cal.Rptr. 332].) In *San Bernardino County Department of Public Social Services v. Superior Court,* this court applied the analysis set forth in *Press-Enterprise II* and observed that dependency proceedings historically have not been open to the public. (*San Bernardino County Dept. of Public Social Services v. Superior Court, supra,* at p. 198.) Such proceedings have been intended as private, informal, nonadversarial proceedings aimed at rehabilitation, as opposed to punishment. (*Ibid.*) In discussing the second consideration, we recognized that openness may expose deficiencies in the system and promote improvements to the juvenile dependency process. (*Id.* at

p. 201.) In weighing these considerations, we concluded that openness would detract from the goal of rehabilitation. We therefore held that the public does not have a First Amendment right to access in juvenile dependency cases. (232 Cal.App.3d at p. 205.)

In juvenile dependency cases, then, public access is left to the court's discretion. Welfare and Institutions Code section 346 provides that the parties may consent to access or the court may allow the press to attend the proceedings. (See *San Bernardino County Dept. of Public Social Services v. Superior Court, supra*, 232 Cal.App.3d at p. 208.) Where the presumption of openness does not apply, the court exercises broader discretion to limit access. Rather than having to fashion an order that is narrowly tailored to achieve a compelling interest, the court may limit access where there is a reasonable likelihood of prejudice. (*Ibid.*)

In the case *In re Marriage of Burkle, supra*, 135 Cal.App.4th 1045, the court decided whether divorce cases are presumptively open. The court noted that Family Code section 214 ". . . authorizes the court, 'when it considers it necessary in the interests of justice and the persons involved, [to] direct the trial of any issue of fact joined in a proceeding under this code to be private . . . .' " (*In re Marriage of Burkle, supra*, at p. 1056.) The court noted, however, that Family Code section 214 provides the exception, rather than the general rule. (135 Cal.App.4th at p. 1056.)

In applying the two-pronged analysis set forth in *Press-Enterprise II*, the court in *Burkle* noted, "[w]e are not aware of, and Mr. Burkle does not offer, any cases or commentary supporting the notion that divorce proceedings have ever been generally excepted from California's historical tradition of presumptively open civil proceedings. Indeed, in the context of court records, which we address in the succeeding section, California courts have made the point virtually unassailable: '[N]o California case holds or even hints that the principles articulated in these cases [the generally open nature of court files] vary when family law litigation is involved. . . . In general, court files in family law cases should be treated no differently than the court files in any other cases for purposes of considering the appropriateness of granting a motion to seal any of those files.' [Citation.]" (*In re Marriage of Burkle, supra*, 135 Cal.App.4th at p. 1056, citing *In re Marriage of Lechowick* (1998) 65 Cal.App.4th 1406, 1413–1414 [77 Cal.Rptr.2d 395].) The court also noted that the same benefits that public access provides to civil proceedings generally apply to divorce proceedings specifically. (*In re Marriage of Burkle, supra*, at p. 1057.) "We are unable to discern, from policy and precedent, any principled basis for concluding that the same utilitarian values that apply 'with at least equal force' in criminal and civil trials [citation] somehow lose their potency in the context of divorce proceedings." (*Ibid.*)

In light of these considerations, the court held that the constitutional right to access extends to divorce proceedings. The court explained, ". . . the factors that differentiate divorce cases from 'ordinary civil cases'—the intrusions into family privacy that accompany the dissolution of intimate relationships—do not support Mr. Burkle's view that no First Amendment right of access exists in divorce cases. Instead, the factors unique to marital dissolutions are weighed in the balancing process that necessarily occurs in a decision whether to close divorce proceedings or to seal records that are presumptively open. In other words, divorce cases are different only in that they present different factors to be weighed in the balance against First Amendment access rights. Indeed, the issues distinguishing divorce cases from other civil cases—such as psychological evaluations in child custody disputes and the like—are often the subject of statutory exceptions to the general rule of public access, in which the Legislature has already engaged in the necessary balancing of privacy rights and public access rights. Nothing about these exceptions contradicts the conclusion that both historical tradition and the institutional value of open proceedings mandate a presumption of openness in divorce proceedings just as in other civil cases." (*In re Marriage of Burkle, supra*, 135 Cal.App.4th at pp. 1060–1061, fn. omitted.) Therefore, while factors in certain proceedings may justify an exception to the public right of access, other factors are simply taken into consideration in deciding whether to close proceedings that are presumptively open.

In a setting more analogous to the case at hand, a civil commitment proceeding under the Lanterman-Petris-Short (LPS) Act (Welf. & Inst. Code, § 5000 et seq.), the statutory scheme includes a provision to open the proceedings to the public upon a party's request. "Notwithstanding any other provisions of this section, any party to the proceeding may demand that the hearing be public, and be held in a place suitable for attendance by the public." (Welf. & Inst. Code, § 5118.) This language suggests that the proceedings are private unless the parties request otherwise. (Compare with *Com. v. Milice* (1991) 401 Pa.Super. 96, 99 [584 A.2d 997] [holding that trial court retains discretion to close the hearing because the statute requires that the hearing be open to the public unless the parties request otherwise].) The LPS Act does not address whether the court retains discretion to deny the request for open proceedings or independently authorize public access.

We have found no cases addressing the question of whether the First Amendment right to access extends to proceedings under the SVPA or any other California statute governing civil commitment proceedings. And, unlike with juvenile dependency proceedings or proceedings under the LPS Act, there also is no statute addressing public access to proceedings under the SVPA. As noted by defendant's attorney, involuntary civil commitment proceedings typically are closed proceedings. Because such proceedings are aimed at determining the status of a person's mental health, they involve

primarily personal and confidential matters. As with juvenile dependency proceedings, while openness would expose any deficiencies and allow for improvements in the process, it would seriously undermine the goals involved in these cases. The two considerations set forth in *Press-Enterprise II*, therefore, appear to weigh against extending the public right of access to involuntary civil commitment proceedings.

Limiting public access seems consistent with the purpose behind the SVPA. The California Supreme Court has maintained that, "[t]he SVPA . . . is protective rather than punitive in its intent. . . . [I]n enacting the SVPA 'the Legislature disavowed any "punitive purpose[]," and declared its intent to establish "civil commitment" proceedings in order to provide "treatment" to mentally disordered individuals who cannot control sexually violent criminal behavior. [Citations.] The Legislature also made clear that, despite their criminal record, persons eligible for commitment and treatment as SVP's are to be viewed "not as criminals, but as sick persons." [Citation.] Consistent with these remarks, the SVPA was placed in the Welfare and Institutions Code, surrounded on each side by other schemes concerned with the care and treatment of various mentally ill and disabled groups. (See, e.g., §§ 5000 [LPS Act], 6500 [Mentally Retarded Persons Law].)' [Citation.]" (*People v. Vasquez* (2001) 25 Cal.4th 1225, 1231–1232 [108 Cal.Rptr.2d 610, 25 P.3d 1090], quoting *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1171 [81 Cal.Rptr.2d 492, 969 P.2d 584].)

■ In light of this purpose, a civil commitment proceeding revolves around the assessment of whether the defendant has been diagnosed with a mental disorder and is likely to commit other acts of sexual violence in the future. (Welf. & Inst. Code, §§ 6604, 6600, subd. (a).) The defendant must be evaluated by two practicing psychiatrists or psychologists, who then will make their evaluation reports available to the parties and the court. (Welf. & Inst. Code, § 6601, subd. (d).) The defendant also may obtain his own expert to conduct an independent evaluation. (Welf. & Inst. Code, § 6603, subd. (a).) The jury trials in these cases, therefore, consist largely of testimony by psychiatrists or psychologists discussing the defendant's mental disorder and current dangerousness.

While the psychological reports must be made available to the parties and the court (see Welf. & Inst. Code, §§ 5328, subd. (f), 6601, subd. (d); *Albertson v. Superior Court* (2001) 25 Cal.4th 796, 805 [107 Cal.Rptr.2d 381, 23 P.3d 611]; *People v. Angulo* (2005) 129 Cal.App.4th 1349, 1363 [30 Cal.Rptr.3d 189]), they remain confidential for all other purposes. Psychological evaluations obtained in the course of providing services under the SVPA are confidential. (Welf. & Inst. Code, § 5328; *People v. Martinez* (2001) 88 Cal.App.4th 465, 474–475 [105 Cal.Rptr.2d 841].) While Welfare and

Institutions Code section 6603 permits disclosure of defendant's psychological records to the district attorney for use in the civil commitment proceedings, the statute does not authorize their release to the general public. The Legislature's decision specifically to authorize disclosure to certain individuals, including the district attorney, implies that the documents should not be made available to just anyone. To allow open access to the public would make Welfare and Institutions section 6603 entirely unnecessary.

Additionally, the court cannot serve as a conduit through which confidential information is transmitted to other members of the public (see *County of Riverside v. Superior Court* (1974) 42 Cal.App.3d 478, 481 [116 Cal.Rptr. 886]). In rejecting a request by a state agency for confidential records, we explained that, ". . . the plain language of the exception to confidentiality contained in subdivision (f) of section 5328 says that information and records may be disclosed *to the courts*, not to an administrative agency *through the courts*." (*County of Riverside, supra*, 42 Cal.App.3d at p. 481, original italics.) If such is the case for an administrative agency, then the same is true for the public at large. While these confidential reports can be used during civil commitment proceedings, they nonetheless retain their confidential nature and should not be made available to the public.

There is, therefore, a compelling basis for arguing that involuntary civil commitment proceedings under the SVPA are not ordinary civil proceedings that must be open to the public. Other states that have addressed similar issues have come to different conclusions based on their rules governing public access, the particular civil commitment statute involved, or their rules concerning the confidentiality of medical information. (See, e.g., *State v. Koch* (1999) 169 Vt. 109, 115 [730 A.2d 577] [holding that the court erred in excluding the press from a hearing on the state's motion to revoke the criminal defendant's order of nonhospitalization, particularly because the defendant's medical records were not confidential under Vermont law]; *In re Belk* (1992) 107 N.C. App. 448, 452, 454 [420 S.E.2d 682] [affirming court's decision to close the hearing for the involuntary commitment of a violent family member to a state hospital because, under North Carolina law, the public's right to access does not extend to civil cases and civil commitment proceedings were intended to be private, informal, and nonadversarial].) However, in light of the rules governing public access in California, we are reluctant to require absolute closure in these cases. Our Supreme Court has made it clear that courts should attempt to safeguard the defendant's rights through less restrictive means rather than completely barring public access. (See *NBC Subsidiary, supra*, 20 Cal.4th at p. 1203, citing *Globe Newspaper Co. v. Superior Court, supra*, 457 U.S. at p. 607.)

■ Moreover, while civil commitment proceedings involve a determination of the defendant's mental health, the case also involves the defendant's past convictions, which are a matter of public concern and the records of which already are available to the public. Also, a sexually violent predator has a lesser expectation of privacy in his psychological records. (See *People v. Martinez, supra*, 88 Cal.App.4th at p. 478.) It is not entirely clear, therefore, whether some access would be appropriate, provided that the court take precautions to protect confidential information. Because of these and other considerations, we think the decision is best left to the Legislature, which is better equipped to hear the competing interests involved in these cases and formulate a rule concerning public access in SVPA proceedings.

### B. *Broadcasting Civil Commitment Proceedings*

We turn to the specific question in this case, namely, whether the trial court properly granted the media's request to televise or videotape the proceedings.

Defendant claims that the trial court erred when it allowed the media to videotape his trial. Defendant specifically argues that the trial court failed to apply rule 1.150, which provides that a request to televise the proceedings must be made by a timely motion and that a grant of such a request must be based on the consideration of several enumerated factors.

The People appear to argue that because the June 9, 2005, hearing was held in response to defendant's request to close the proceedings, the trial court had no obligation to apply rule 1.150 before allowing the media to record the proceedings. What the People fail to appreciate, however, is that regardless of who initially made the motion, the court still must apply the law in addressing the particular question presented. The record indicates that defendant preemptively asked the court to preclude the media from televising his trial. The record also shows that, in opposing defendant's motion, the media sought to televise or videotape the proceedings. The question of whether the proceedings should be videotaped was squarely before the court.

Although not discussed by the parties, there are two United States Supreme Court cases addressing the general question of whether the press should be allowed to broadcast or videotape judicial proceedings. The question was first presented to the Supreme Court in *Estes v. Texas* (1965) 381 U.S. 532 [14 L.Ed.2d 543, 85 S.Ct. 1628]. In *Estes*, during the pretrial hearing on the media's request to broadcast the proceedings, there were 12 cameramen in the courtroom, taking still and motion pictures. There were cables and wires

all across the courtroom floor with microphones on the bench, and directed at the jury box and counsel's table. For the trial, however, the court had ordered the media to construct a booth in the back of the courtroom and restricted all filming and broadcasting to that location. (*Estes, supra*, at pp. 536–537.)

The court in *Estes* issued six separate opinions. By a plurality vote, the court held that the right to access does not include the right to televise the proceedings. (*Estes v. Texas, supra*, 381 U.S. at p. 539 (plur. opn. by Clark, J.); *id.* at p. 587 (conc. opn. of Harlan, J.).)

Justice Harlan wrote, "The free speech and press guarantees of the First and Fourteenth Amendments are also asserted as embodying a positive right to televise trials, but the argument is greatly overdrawn. Unquestionably, television has become a very effective medium for transmitting news. Many trials are newsworthy, and televising them might well provide the most accurate and comprehensive means of conveying their content to the public. Furthermore, television is capable of performing an educational function by acquainting the public with the judicial process in action. Albeit these are credible policy arguments in favor of television, they are not arguments of constitutional proportions. The rights to print and speak, over television as elsewhere, do not embody an independent right to bring the mechanical facilities of the broadcasting and printing industries into the courtroom. Once beyond the confines of the courthouse, a news-gathering agency may publicize, within wide limits, what its representatives have heard and seen in the courtroom. But the line is drawn at the courthouse door; and within, a reporter's constitutional rights are no greater than those of any other member of the public. Within the courthouse the only relevant constitutional consideration is that the accused be accorded a fair trial. If the presence of television substantially detracts from that goal, due process requires that its use be forbidden." (*Estes v. Texas, supra*, 381 U.S. at p. 589 (conc. opn. of Harlan J.).)

In addressing Texas's argument that the defendant had failed to isolate and articulate the actual prejudice suffered as a result of the media's intrusion, the plurality in *Estes* held that the inherent prejudice involved in televising or videotaping the proceedings was sufficient to warrant a reversal. (*Estes v. Texas, supra*, 381 U.S. at pp. 541–544 (plur. opn. by Clark, J.); *id.* at pp. 591–592 (conc. opn. of Harlan, J.).) In writing for the plurality, Justice Clark specifically identified several potential impacts that televising the proceedings could have on the trial, including the jury's exposure to extraneous information and public pressure, the distraction caused by the equipment, the witnesses' potential access to the testimony of preceding witnesses, the added pressure of being on camera and the temptation to put on a good performance, and the effect on the defendant's ability to communicate

privately with his attorney and concentrate on presenting his defense. (*Id.* at pp. 544–548.) "A defendant on trial for a specific crime is entitled to his day in court, not in a stadium, or a city or nationwide arena. The heightened public clamor resulting from radio and television coverage will inevitably result in prejudice." (*Id.* at p. 549.) Justice Clark explained that, while these potential impacts may escape exact measurement, they cannot be ignored or dismissed as purely hypothetical. (*Ibid.*)

The plurality opinion in *Estes*, however, recognized that the full effects of televising trials were unknown and, therefore, left room for future consideration of what was a relatively new application of technology in 1965. (See *Estes v. Texas, supra*, 381 U.S. at pp. 540, 541, 551–552.) Justice Clark closed with the comment: "It is said that the ever-advancing techniques of public communication and the adjustment of the public to its presence may bring about a change in the effect of telecasting upon the fairness of criminal trials. But we are not dealing here with future developments in the field of electronics. Our judgment cannot be rested on the hypothesis of tomorrow but must take the facts as they are presented today." (*Id.* at pp. 551–552 (plur. opn. by Clark, J.).) Justice Harlan also added, "we should not be deterred from making the constitutional judgment which this case demands by the prospect that the day may come when television will have become so commonplace an affair in the daily life of the average person as to dissipate all reasonable likelihood that its use in courtrooms may disparage the judicial process. If and when that day arrives the constitutional judgment called for now would of course be subject to re-examination in accordance with the traditional workings of the Due Process Clause." (*Id.* at pp. 595–596 (conc. opn. of Harlan, J.).)

An occasion for further consideration presented itself in *Chandler v. Florida* (1981) 449 U.S. 560 [66 L.Ed.2d 740, 101 S.Ct. 802]. There, the court addressed the question of whether the state may experiment with different forms of electronic media. In 1937, the American Bar Association (ABA) adopted judicial canon 35, which recommended the prohibition of broadcast coverage of courtroom proceedings. (*Chandler, supra*, at pp. 562–563.) In 1952, the ABA amended canon 35 to include television coverage. (*Chandler*, at p. 563.) At the time the Supreme Court issued its opinions in *Estes*, as recommended by the ABA, the federal rules and 48 of the states prohibited television coverage of courtroom proceedings. (*Estes v. Texas, supra*, 381 U.S. at p. 544.) This included Florida, which adopted the rule as canon 3A(7) of the Florida Code of Judicial Conduct. (*Chandler, supra*, at p. 563.) In 1978, the ABA Committee on Fair Trial-Free Press proposed revised standards, including a provision that allowed television coverage under conditions to be established by the court or local rule. (*Id.* at pp. 563–564.) Although the proposed revisions were rejected, the Conference of State Chief Justices approved a resolution that allowed the states to promulgate their own

standards for the use of different forms of electric media during court proceedings. (*Id.* at p. 564.)

Meanwhile, in response to requests from the media, Florida established a one-year pilot program that allowed electronic media to cover all judicial proceedings under specific guidelines. (*Chandler v. Florida, supra,* 449 U.S. at pp. 564–565.) After the one-year period and after receiving comments from those involved, the Florida Supreme Court concluded that there was more to be gained than lost by allowing media coverage of judicial proceedings. (*Id.* at p. 565.) Florida thereafter revised canon 3A(7) of the Florida Code of Judicial Conduct to permit the use of electronic media coverage again under specific guidelines. (449 U.S. at p. 566.) The guidelines allowed only the use of one camera and one camera technician. The equipment must be in a fixed location and could not be moved during the trial. Any additional recording devices had to be located outside the courtroom. The guidelines also restricted the use of artificial lighting, the recording of private communications, and other intrusions or distractions. The court retained discretion to prohibit all coverage if it would have a deleterious effect on the defendant's right to a fair trial and exercised plenary discretion to prohibit coverage of certain witnesses. (*Ibid.*)

In *Chandler,* the defendants were Miami Beach policemen who committed a burglary at a well-known restaurant. Over the defendant's objection, the trial court allowed the media to televise the proceedings. The media video-taped only the testimony of the prosecution's chief witness and closing arguments. (*Chandler v. Florida, supra,* 449 U.S. at pp. 567–568.)

In challenging the court's order allowing the media to videotape the proceedings, the defendants relied on the *Estes* case. They argued that *Estes* established a per se constitutional rule that the televising of criminal trials is inherently a denial of due process. Although the Supreme Court affirmed the basic holding in *Estes* that the First Amendment right to access does not include the right to televise the proceedings, the court rejected the defendants' interpretation that *Estes* established a per se rule that televising proceedings necessarily violates due process. (*Chandler v. Florida, supra,* 449 U.S. at p. 570.)

The Supreme Court instead interpreted *Estes,* particularly in light of Justice Harlan's concurring opinion, as holding that televising the court proceedings was a denial of a fair trial based on the particular facts in that case. (*Chandler v. Florida, supra,* 449 U.S. at p. 573.) Although both Justice Clark's plurality opinion and Justice Harlan's concurring opinion provided unequivocal responses to the state's argument that the defendant had failed to show isolatable prejudice, the Supreme Court, as stated in *Chandler,* later

emphasized that the potential prejudices discussed in that opinion in fact materialized during the proceedings and undoubtedly affected the defendant's trial in that case. (*Ibid.*; see also *Murphy v. Florida* (1975) 421 U.S. 794, 798 [44 L.Ed.2d 589, 95 S.Ct. 2031]; *Nebraska Press Assn. v. Stuart* (1976) 427 U.S. 539, 552 [49 L.Ed.2d 683, 96 S.Ct. 2791].)

Rather than a per se rule against televising court proceedings, the Supreme Court in *Chandler* held that, to establish a due process violation, the defendant must show that media coverage in his case had an adverse impact on his trial. (*Chandler v. Florida, supra*, 449 U.S. at p. 581.) In other words, the Supreme Court essentially concluded that, even if there had been previously, there is no longer any basis to presume that prejudice would result from media coverage. The Supreme Court noted that, because of the advances in electronic technology, the media's presence in the courtroom is less distracting and cumbersome than at the time of the defendant's trial in *Estes*. (*Chandler, supra*, 449 U.S. at p. 576.) The Supreme Court also noted that courts have developed curative devices to avoid prejudice and safeguards to protect the judicial process. (*Id.* at pp. 574–575, 577.) For example, in Florida, courts are admonished to take special precautions to protect certain witnesses, including children, victims of sex crimes, and informants, from the media and the stress of being on camera. (*Id.* at p. 577.)

The Supreme Court concluded, "[w]hatever may be the 'mischievous potentialities [of broadcast coverage] for intruding upon the detached atmosphere which should always surround the judicial process,' [citation], at present no one has been able to present empirical data sufficient to establish that the mere presence of the broadcast media inherently has an adverse effect on that process. [Citation.] The appellants have offered nothing to demonstrate that their trial was subtly tainted by broadcast coverage—let alone that all broadcast trials would be so tainted." (*Chandler v. Florida, supra*, 449 U.S. at pp. 578–579.) Without a demonstration that the media coverage actually affected defendant's trial, the Supreme Court concluded that states must be free to experiment and specifically upheld Florida's experimental program. (*Id.* at pp. 582–583.)

As stated in *Estes* and affirmed in *Chandler*, the public and the press do not have a constitutional right to televise the proceedings or videotape them for future broadcasting. (*Estes v. Texas, supra*, 381 U.S. at p. 539; *Chandler v. Florida, supra*, 449 U.S. at p. 569; see also *Nixon v. Warner Communications, Inc.* (1978) 435 U.S. 589, 610 [55 L.Ed.2d 570, 98 S.Ct. 1306].) Based on the information available when the Supreme Court decided *Chandler*, the court recognized that television coverage was not as mischievous as previously thought, and the cautious use of modern technology could advance the public interest without infringing upon the defendant's right to a

fair trial. The court in *Chandler* left it up to the states to adopt their own rules, permitting the states to delegate authority to the trial courts to decide whether press coverage would be appropriate on a case-by-case basis. When a party challenges the court's decision on constitutional grounds, the party must demonstrate actual prejudice. (See *Chandler, supra,* at p. 582.)

### C. *Rule 1.150*

■ California's guidelines for determining whether to allow the press to televise or videotape judicial proceedings are set forth in rule 1.150. (*Marin Independent Journal v. Municipal Court* (1993) 12 Cal.App.4th 1712, 1718 [16 Cal.Rptr.2d 550].) As in other states, California has moved from a restrictive approach to a more open, yet cautious approach. (*KFMB-TV Channel 8 v. Municipal Court* (1990) 221 Cal.App.3d 1362, 1367 [271 Cal.Rptr. 109] [discussing amendments to rule 1.150].)

The general rule is stated in 1.150 rule (c): "Except as provided in this rule, court proceedings may not be photographed, recorded, or broadcast." The exception to the general rule is set forth in rule 1.150(e):

**"(e) Media coverage**

"Media coverage may be permitted only on written order of the judge as provided in this subdivision. The judge in his or her discretion may permit, refuse, limit, or terminate media coverage. This rule does not otherwise limit or restrict the right of the media to cover and report court proceedings.

**"(1)** *Request for order*

"The media may request an order on *Media Request to Photograph, Record, or Broadcast* (form MC-500). The form must be filed at least five court days before the portion of the proceeding to be covered unless good cause is shown. A completed, proposed order on *Order on Media Request to Permit Coverage* (form MC-510) must be filed with the request. The judge assigned to the proceeding must rule on the request. If no judge has been assigned, the request will be submitted to the judge supervising the calendar department, and thereafter be ruled on by the judge assigned to the proceeding. The clerk must promptly notify the parties that a request has been filed.

**"(2)** *Hearing on request*

"The judge may hold a hearing on the request or may rule on the request without a hearing.

"(3) *Factors to be considered by the judge*

"In ruling on the request, the judge is to consider the following factors:

"(A) The importance of maintaining public trust and confidence in the judicial system;

"(B) The importance of promoting public access to the judicial system;

"(C) The parties' support of or opposition to the request;

"(D) The nature of the case;

"(E) The privacy rights of all participants in the proceeding, including witnesses, jurors, and victims;

"(F) The effect on any minor who is a party, prospective witness, victim, or other participant in the proceeding;

"(G) The effect on the parties' ability to select a fair and unbiased jury;

"(H) The effect on any ongoing law enforcement activity in the case;

"(I) The effect on any unresolved identification issues;

"(J) The effect on any subsequent proceedings in the case;

"(K) The effect of coverage on the willingness of witnesses to cooperate, including the risk that coverage will engender threats to the health or safety of any witness;

"(L) The effect on excluded witnesses who would have access to the televised testimony of prior witnesses;

"(M) The scope of the coverage and whether partial coverage might unfairly influence or distract the jury;

"(N) The difficulty of jury selection if a mistrial is declared;

"(O) The security and dignity of the court;

"(P) Undue administrative or financial burden to the court or participants;

"(Q) The interference with neighboring courtrooms;

"(R) The maintenance of the orderly conduct of the proceeding; and

"(S) Any other factor the judge deems relevant."

Based on rule 1.150, defendant raises two specific contentions. Defendant first contends that, under subdivision (e)(1), the media's request to videotape the proceedings was untimely. According to rule 1.150(e)(1), the request must be filed at least five court days before the proceeding unless the media shows good cause. To comply with this provision, the media should have filed a separate form with its request at least five days before the first hearing to be televised. In this case, The Press-Enterprise filed only an opposition to defendant's motion on June 9, 2005, the day of the hearing. As defendant contends, the media's request was untimely.

■ The People argue that defendant cannot complain of a lack of notice because his motions indicated that he anticipated media coverage. Although a party's foresight in preparing for trial should not excuse others from providing notice when required, we agree that the lack of notice did not catch defendant by surprise or cause any prejudice. (See *People v. Spring* (1984) 153 Cal.App.3d 1199, 1207 [200 Cal.Rptr. 849].)

Defendant's second and main contention is that the trial court failed to consider the relevant factors listed in subdivision (e) of rule 1.150. Before addressing the exception, we note that the general rule implies a presumption against opening the courtroom to unlimited media coverage. While many of the potential risks associated with having cameras in the courtroom have been minimized with improvements in technology and the application of other conditions, such as limiting the media to the use of one camera (see rule 1.150(e)(8)(A)), there remain some serious concerns in balancing the defendant's interest in a fair trial and the public's interest in observing the judicial process. (See *Westmoreland v. Columbia Broadcasting System, Inc.* (2d Cir. 1984) 752 F.2d 16, 23, fn. 10.)

As with public access generally, there is no rule or statute concerning media coverage of civil commitment proceedings under the SVPA. Rule 1.150, therefore, provides the framework for analysis. Under rule 1.150(e), ". . . it is clear that the threshold determination as to whether representatives of the electronic media and their equipment should be allowed access is left to the court which must exercise its discretion to fairly balance the respective interests of the parties and the public and the effect of electronic coverage on the fair administration of justice." (*KFMB-TV Channel 8 v. Municipal Court, supra,* 221 Cal.App.3d at p. 1367.)

Some of the relevant factors include the following: the importance of maintaining public trust in the judicial system (rule 1.150(e)(3)(A)); the

importance of promoting public access (rule 1.150(e)(3)(B)); the parties' preferences (rule 1.150(e)(3)(C)); the nature of the case (rule 1.150(e)(3)(D)); the privacy rights of all the participants (rule 1.150(e)(3)(E)); and the effect of coverage on the witness's willingness to cooperate (rule 1.150(e)(3)(K)). As to the first two factors, the public undoubtedly has an interest in having access to the courts and ensuring the integrity of the factfinding process. (See *Globe Newspaper Co. v. Superior Court, supra,* 457 U.S. at p. 606; *NBC Subsidiary, supra,* 20 Cal.4th at p. 1207.) Particularly, in an SVPA case, the proceedings will determine whether to hold in custody or release individuals who have been identified or adjudicated as sexually violent predators. Because these individuals potentially pose a danger to society, the public has a legitimate interest in these proceedings.

In light of the other factors, however, there may have been other ways to preserve the public's interest without allowing cameras in the courtroom. Although the trial court acknowledged that it had discretion to allow the media to cover the proceedings, it appears that the court did not give proper consideration to the other factors. Moreover, because counsel for the People and the press relied primarily on the *NBC Subsidiary* case, it is unclear whether the court inappropriately applied a presumption that the proceedings had to be open. Reliance on the right to access cases is entirely inapposite to the question of whether to allow cameras in the courtroom. (See *Westmoreland v. Columbia Broadcasting System, Inc., supra,* 752 F.2d at pp. 22–23.)

As to the nature of the case, the court seemed to treat this case no differently than any other civil case. A proceeding under the SVPA is not an ordinary civil case, but a special proceeding of a civil nature. (See *People v. Yartz* (2005) 37 Cal.4th 529, 536 [36 Cal.Rptr.3d 328, 123 P.3d 604].) As discussed above, the trial revolves around the determination of whether defendant should be committed involuntarily in a state mental hospital based on his diagnosed mental disorder and dangerousness. The nature of the case, therefore, should have weighed against permitting the press to televise or videotape the proceedings.

As to the parties' preference, defendant obviously objected to media coverage. One of defendant's specific objections was the disclosure of confidential information concerning his mental health. Defendant's attorney explained, "[T]here is nothing in 6600 et seq. that indicates that . . . material, which is confidential and in an arena that is historically private, can then be turned over to the press. [¶] Obviously, the court's file may contain psychological reports, and the district attorney's office may have access to psychological reports. And we can see from the previous activity, in terms of the prior coverage by the Press-Enterprise, that the Press-Enterprise has gained,

either via the district attorney's office or via the court file, access to at least part of the psychological evaluations involved in this case. And not only have they gained access to that for their own use, but they have not seen fit to restrain themselves in terms of actually publishing that." As stated above, the use of defendant's psychological reports in a civil commitment proceeding does not transform them from being confidential to being open and accessible to the public. (Welf. & Inst. Code, § 5328; see also *People v. Gardner* (1984) 151 Cal.App.3d 134, 141–142 [198 Cal.Rptr. 452] [holding that the court erred in permitting confidential information to remain in a probation report].) The record shows that the media had access to defendant's psychological reports and released confidential information concerning his medical treatment to the public.

Another factor raised by defendant was his witnesses' unwillingness to testify. Defendant's attorney explained that the defense witnesses had expressed reservations about testifying because of the press coverage. While the prospects of finding defense witnesses to testify on behalf of a sexually violent predator are arguably slim, the added media coverage may have made matters worse for the defense. Even if it was unclear whether these potential witnesses would have been more cooperative without the pressure of being on camera, this factor nevertheless weighs in favor of a closed proceeding.

Defendant's attorney filed 11 declarations or supplemental declarations describing the effect of the press coverage on defendant's trial. In addition to the factors discussed above, some of defendant's attorney's other concerns included that she sometimes was unable to communicate privately with defendant in the courtroom because of the microphones and camera. ". . . I need to be able to talk to respondent privately in the court while court is in session and during the breaks without having a reporter sitting close enough to hear us, without a television microphone close enough to record our voices, and without a television camera videotaping what we are saying to each other." According to defendant's attorney, the cameraperson from CBS 2 moved around the courtroom and, during defendant's attorney's closing argument, stood next to the alternate jurors. Defendant's attorney explained, "[d]efending a person on a W&I 6600 case is extremely demanding. It requires a great deal of concentration to detail. It is mentally, emotionally and physically draining. The presence of the cameraman so close to me and in my line of sight was both very intimidating and very distracting." Defendant's attorney also noted that, at one point in the proceeding, there was a second, unauthorized, cameraperson inside the courtroom with a still or motion camera sitting next to The Press-Enterprise reporter in the front row of the audience. Because of the extensive print and television coverage of defendant's case, defendant's attorney expressed concern that, despite the court's admonition, the jury inevitably would be exposed to extraneous information. The coverage also may have been one-sided because, as noted by defendant's

attorney, the cameraperson filmed the direct examination of some of the key witnesses and experts, but did not return to film their cross-examinations. Many of these concerns were anticipated by defendant's attorney and raised during the hearing on defendant's motion.

■ We conclude that the trial court abused its discretion in allowing the media to broadcast or videotape defendant's trial. The record shows that the court may have applied a presumption of openness and imposed upon defendant the burden of overcoming that presumption. According to rule 1.150, however, broadcasting and recording is not allowed unless the court reasonably exercises its discretion in accordance with that provision. The factors, particularly the unusual nature of a civil commitment proceeding under the SVPA, should have weighed in favor of excluding cameras from the courtroom. The other factors discussed above further highlight the inappropriateness of such media coverage. Although the public has a legitimate interest in these cases, its interest can be protected without the additional intrusion of a camera in a proceeding that involves mostly sensitive information, including records of defendant's psychological treatment and testimony from adult and minor victims of sex crimes.

### D. *Prejudice*

In these cases, it is difficult to assess the extent of the harm caused by the court's erroneous ruling. It is also difficult to determine when an erroneous ruling would warrant a reversal. It seems logical that a reversal would be appropriate only when the erroneous ruling caused such harm that it adversely affected the judgment. In other words, there must be a showing that the defendant was denied a fair trial.

In the context of addressing the effect of media coverage on jurors, the United States Supreme Court stated the standard for determining prejudice as follows: "To demonstrate prejudice in a specific case a defendant must show something more than juror awareness that the trial is such as to attract the attention of broadcasters. [Citation.] No doubt the very presence of a camera in the courtroom made the jurors aware that the trial was thought to be of sufficient interest to the public to warrant coverage. Jurors, forbidden to watch all broadcasts, would have had no way of knowing that only fleeting seconds of the proceeding would be reproduced. But the appellants have not attempted to show with any specificity that the presence of cameras impaired the ability of the jurors to decide the case on only the evidence before them or that their trial was affected adversely by the impact on any of the participants of the presence of cameras and the prospect of broadcast." (*Chandler v. Florida, supra*, 449 U.S. at p. 581.) As indicated by the court,

the standard is whether the camera equipment, the broadcasts, or the prospect of future broadcasts adversely affected defendant's trial and amounted to a denial of due process.

Although defendant argues that the press coverage affected his right to present a defense and his right to counsel, the record in this case does not show that the media's presence was anything akin to the "Roman circus" or "Yankee Stadium" atmosphere of the *Estes* case. (See *Chandler v. Florida, supra,* 449 U.S. at p. 582; *Estes v. Texas, supra,* 381 U.S. at pp. 536, 550–551.) While CBS 2 may have placed a microphone at the counsel table at one point during the proceedings and while the cameraperson may have stood next to the alternate jurors during closing argument, defendant cannot claim that there were reporters, cameras, and wires everywhere. The record shows that the court, for the most part, maintained control over the courtroom and attempted to minimize the impact of the media's presence during defendant's trial.

Defendant's attorney described how the press coverage affected her performance and the defense witnesses. Although the media's presence may have hindered communication between counsel and her client and may have distracted counsel during the trial, defendant has not shown how such adverse affects deprived him of a fair trial. As to the witnesses, as noted by the court, defendant could have subpoenaed them. Defendant argues that forcing the witnesses to appear in court would not have garnered favorable testimony from those who already had reservations about testifying on behalf of a sex offender. Even so, defendant cannot show how the additional testimony would have affected the jury's verdict.

The jury's verdict rested almost entirely on the testimony of the psychological experts. Despite defendant's claim that this was a close case, the record shows that, if it were not for the salacious details and the press coverage, the case would have been nothing more than a routine case for recommitment under the SVPA. The prosecution and defense experts agreed on the diagnosis. The only real issue before the jury was whether defendant continued to present a danger to society because of his age. The defense expert testified that defendant's age made him less likely to reoffend. As to this key issue, the testimony of additional lay witnesses would not have made a difference. The jury's verdict was based primarily on its evaluation of the testimony of the expert witnesses. While the media coverage in this case and the presence of the camera and reporters in the courtroom may have been inappropriate, they did not adversely affect defendant's trial.

We therefore conclude that defendant has failed to demonstrate that he was denied a fair trial.

### 4. Discovery

Defendant claims the trial court erred in denying his request to compel the prosecutor to disclose the current contact information for two prosecution witnesses who also were victims in the underlying crimes. Defendant specifically argues that the prosecutor and the trial court erroneously relied on Penal Code section 293, subdivision (c), to deny his request. Defendant also argues that the Civil Discovery Act applied and that he was entitled to the victims' contact information under the Act and under the due process clause of the federal Constitution.

Defendant correctly notes that the Civil Discovery Act applied and that the trial court erred in relying on Penal Code section 293. The record reveals that the parties were operating under the incorrect assumption that the rules governing criminal discovery applied to a civil commitment proceeding under the SVPA. Although defendant now asserts his rights under the Civil Discovery Act, we cannot conclude that the trial court erred in denying his request where defendant failed to make a timely demand as required under the Act.

█ As noted by defendant, a proceeding under the SVPA is civil in nature (*Hubbart v. Superior Court, supra*, 19 Cal.4th at p. 1166; *Sporich v. Superior Court* (2000) 77 Cal.App.4th 422, 427 [91 Cal.Rptr.2d 752]), which both affects the defendant's rights and determines what rules of discovery apply (*People v. Fulcher* (2006) 136 Cal.App.4th 41, 55 [38 Cal.Rptr.3d 702]). A defendant in an SVPA proceeding does not have a Sixth Amendment right to confront witnesses against him. Instead, he has a general due process right of confrontation that applies to civil proceedings. (*Fulcher, supra*, at p. 55.) Also, rather than the statutes governing discovery in criminal cases, discovery in a civil commitment proceeding under the SVPA is governed by the Civil Discovery Act. (See Code Civ. Proc., § 2016.020, subd. (b); *People v. Superior Court (Cheek)* (2001) 94 Cal.App.4th 980, 995 [114 Cal.Rptr.2d 760] (*Cheek*); *People v. Angulo, supra*, 129 Cal.App.4th at p. 1358.)[2]

█ Under the Civil Discovery Act, ". . . any party may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action or to the determination of any motion made in that action . . . . Discovery may be obtained of the identity and location of persons having knowledge of any discoverable matter . . . ." (Code Civ. Proc.,

---

[2] We are not asserting an opinion, however, as to whether all the specific procedures afforded under the Civil Discovery Act apply in SVPA proceedings. We note that Division Three of this district has held that, in SVPA proceedings, the use of a request for admission under Code of Civil Procedure section 2019.010, subdivision (e), would violate a defendant's due process rights. (*Murillo v. Superior Court* (2006) 143 Cal.App.4th 730, 740 [49 Cal.Rptr.3d 511].)

§ 2017.010.) The disclosure of the names and addresses of potential witnesses is a routine and essential part of pretrial discovery. (See *In re Littlefield* (1993) 5 Cal.4th 122, 132 [19 Cal.Rptr.2d 248, 851 P.2d 42].) The Civil Discovery Act also provides that a party may obtain information by the use of various methods, including oral and written depositions. (Code Civ. Proc., § 2020.010, subd. (a).) The party's ability to subpoena witnesses presumes that he has the witnesses' contact information. As noted by defendant, although the witnesses may resist a subpoena, there is no justification for depriving defendant's attorney of the opportunity to seek an interview in the first place. Certainly, one party's ability to cross-examine the witness at trial does not absolve the other party of his pretrial discovery obligations.

The People contend that defendant was not entitled to disclosure in this case for a few reasons. First, the People argue that defendant was required to show good cause. In support of this argument, the People cite *Vinson v. Superior Court* (1987) 43 Cal.3d 833 [239 Cal.Rptr. 292, 740 P.2d 404], a case involving sexual harassment. The *Vinson* case relies on Code of Civil Procedure section 2036.1, which has been repealed. (*Vinson, supra*, at pp. 843–844, citing Code Civ. Proc., former § 2036.1, repealed by Stats. 1986, ch. 1334, § 1, p. 4700, operative July 1, 1987.) The language of the former statute now appears only in Code of Civil Procedure section 2017.220. That provision is inapplicable because defendant's request for discovery was not for information concerning the victim's sexual conduct with individuals other than the perpetrator. Rather, the request concerned information directly relevant to the subject matter of the action. None of the authorities cited by the People support its argument that a party must show good cause to discover the names and addresses of the potential witnesses.

Second, the People argue that defendant was not entitled to disclosure because it would result in unwarranted annoyance, embarrassment, oppression, or undue burden for the victims. (See Code Civ. Proc., § 2017.020, subd. (a); *Cheek, supra*, 94 Cal.App.4th at p. 994.) It is, however, unclear how a simple request for the witnesses' contact information could be any of these things. Even in cases involving victims of sexual assaults, it cannot be presumed that such requests would burden the other party or harass the witnesses.

Finally, as argued at trial, the People maintain that Penal Code section 293 barred disclosure of the victim's contact information. Penal Code section 293, subdivision (d), provides: "No law enforcement agency shall disclose to any person, except the prosecutor, parole officers of the Department of Corrections, hearing officers of the parole authority, probation offices of county probation departments, or other persons or public agencies where authorized or required by law, the name of a person who alleges to be the

victim of a sex offense." Contrary to the People's argument, this statute has been interpreted to not preclude disclosure of the victim's information to the public defender. (*Reid v. Superior Court* (1997) 55 Cal.App.4th 1326, 1338 [64 Cal.Rptr.2d 714] (*Reid*).) According to the court in *Reid*, the public defender qualifies as an authorized person to receive the victim's contact information. (*Ibid.*, citing Pen. Code, § 1054.)

None of the arguments raised in the People's brief provides adequate justification for denying defendant's request. As observed in *Reid*, "as a general rule, '[a] lawyer may properly interview any witness or prospective witness for the opposing side in any civil or criminal action without the consent of opposing counsel or party.' [Citations.] Generally, '[a] defendant is entitled to have access to any prospective witness although such a right of access may not lead to an actual interview.' [Citation.]" (*Reid, supra*, 55 Cal.App.4th at p. 1333.) Defendant here was entitled to discover the contact information for the potential witnesses.

The trial court, however, had a separate basis for denying defendant's request. As discussed during oral argument before us on appeal, under the Civil Discovery Act, defendant should have made a timely demand for the identity and whereabouts of the prosecution witnesses. Specifically, defendant should have completed discovery 30 days before the date set for trial. (See Code Civ. Proc., § 2024.020; *Beverly Hospital v. Superior Court* (1993) 19 Cal.App.4th 1289, 1294 [24 Cal.Rptr.2d 238].) Defendant did not make a demand for discovery before trial. Also, when defendant made his request during the trial, he did not argue that he was entitled to the victim's contact information under Code of Civil Procedure section 2017.010. By stating the specific ground for his request, defendant would have given the trial court an opportunity to respond and fashion an appropriate remedy. Although the parties and the court may have been operating under an incorrect assumption about the rules governing discovery in an SVPA proceeding, defendant cannot claim the benefits of the civil discovery rules without demonstrating compliance with its requirements.

We conclude, therefore, that, while defendant was entitled to the victims' current contact information under the Civil Discovery Act, the court had no obligation to grant his request in the absence of a timely demand.

### 5. Disposition

We affirm the judgment.

Ramirez, P. J., and King, J., concurred.