Filed 3/20/26  P. v. Mendoza CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B341177 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA158412) |
| v. | |
| LUIS MENDOZA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Teresa P. Magno, Judge.  Reversed and remanded.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Taylor Nguyen and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

A jury found Luis Mendoza guilty of the second degree murder and assault of Delmar Lee Norris. Norris, a 63-year-old man, was walking with a cane when Mendoza ran up behind him and, without warning, punched him in the back of the head. Norris fell face-first onto the concrete sidewalk and hit his head. He was dead before paramedics arrived.

Mendoza contends there is insufficient evidence of implied malice to support the conviction of second degree murder. He also asserts numerous trial errors, including several related to: jury instructions; prosecutorial misconduct in closing arguments; the trial court's response to Mendoza's possession of the list of jurors and his disclosure of the jurors' names to his family members; and the court's denial of his requests to discharge his retained counsel. Mendoza additionally asserts claims of sentencing error related to the court's findings on prior strike allegations and its order denying Mendoza's motion to dismiss the strikes; an order prohibiting him from possessing knives; and errors in the abstracts of judgment. He additionally argues he was denied the effective assistance of counsel.

We conclude the prosecutor prejudicially misstated the law in closing arguments and defense counsel was ineffective for failing to object. We therefore reverse the judgment as to the murder conviction and accompanying sentence. However, because we additionally conclude that substantial evidence supported the conviction, Mendoza may be retried. As we are reversing the judgment, we do not address Mendoza's other contentions.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 22, 2022, at 11:29 p.m., Norris was walking on a street in Los Angeles. Norris was 63 years old. He was walking with a cane. Surveillance video from a nearby liquor store showed Mendoza, who was 31 years old, running after Norris and approaching him from behind. Mendoza punched Norris in the back of the head. Norris fell forward onto concrete, making no observable attempt to stop his fall. During the entire interaction—as Mendoza ran up and when he struck Norris—Norris was facing away from Mendoza. As Norris lay on the ground, face down, Mendoza briefly stood over him. Mendoza then walked away and did not look back.

In response to a 911 call, paramedics arrived at approximately 11:50 p.m. Norris did not have a pulse and was not breathing.

A responding Los Angeles Police Department officer observed contusions and blood on Norris's face. He also saw a cane near Norris's body.

Law enforcement did not initially suspect foul play. Thus, the original autopsy involved only an external examination. After officers obtained surveillance video of the incident, the medical examiner's office for Los Angeles County conducted a second autopsy. The autopsies established that Norris had three abrasions on his forehead and two on his nose. Norris's skull had a one-and-three-quarter-inch fracture in the center of his forehead. Norris also had a one-inch subcutaneous hemorrhage behind his ear. A deputy medical examiner testified at trial that the hemorrhage was consistent with Norris being punched in the head.

3

The deputy medical examiner further testified that Norris's injuries were consistent with falling face-first onto concrete. The examiner opined that the cause of Norris's death was "blunt head trauma" due to his skull fracture and "bleeding around the brain," or "subarachnoid hemorrhages." He explained that the force of Norris's head hitting the ground caused his brain to "bounce around." This led to bleeding in the brain and death.

The medical examiner further opined that Norris's cause of death was "homicide." He explained that the surveillance video showed Norris "immediately lost consciousness" and died "within minutes," suggesting a "strong temporal relationship of the death to the punch." Although when Norris died, he had a "large heart"; coronary artery disease; and methamphetamine, cocaine, and marijuana in his system; these medical conditions and drugs did not contribute to his death.

In June 2024, the People charged Mendoza in an amended information with the murder of Norris (Pen. Code, § 187, subd. (a))[1] and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)). As to the assault, the information also alleged Mendoza personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a).

In July 2024, a jury found Mendoza guilty of second degree murder and of assault, and found true the allegation that he personally inflicted great bodily injury during the course of the assault.

Mendoza waived his right to a jury trial on allegations that he had suffered prior strikes and on alleged aggravating factors.

---

[1]     All undesignated statutory references are to the Penal Code.

4

After a bench trial, the trial court found true that Mendoza suffered two strike priors based on two section 245, subdivision (a)(2) assault convictions, both from August 20, 2013. The trial court also found true three aggravating factors under California Rules of Court, rule 4.421: the crime involved a high degree of cruelty, viciousness, or callousness (rule 4.421(a)(1)); the victim was particularly vulnerable (*id.*, (a)(3)); and Mendoza was a serious danger to society (*id.*, (b)(1)).

The trial court sentenced Mendoza to 45 years to life in prison on the murder count, consisting of 15 years to life, tripled for the two strikes. As to the assault count, the trial court sentenced Mendoza to the upper term of four years, plus three years for the great bodily injury enhancement, for a term of seven years, which it stayed pursuant to section 654.

Mendoza timely appealed.

## DISCUSSION

### I. Sufficient Evidence Supports the Jury's Finding That Mendoza Acted with Implied Malice

Mendoza contends there is insufficient evidence of implied malice to support the jury's second degree murder conviction. He asserts that "[p]eople fall all the time, even on hard sidewalks, without dying," assaults happen frequently, boxing is a recreational sport, thus it was not highly likely or foreseeable Norris would die from a single punch. We conclude substantial evidence supports the jury's finding of implied malice.

#### A. Standard of review

" 'The test for evaluating a sufficiency of evidence claim is deferential.' [Citation.]" (*People v. Pierce* (2025) 114 Cal.App.5th 508, 522 (*Pierce*).) To determine whether the evidence is sufficient to sustain a conviction, "we review the entire record in

5

the light most favorable to the judgment of the trial court. We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt." (*People v. Vargas* (2020) 9 Cal.5th 793, 820.) We are required to " ' "presume in support of the judgment the existence of every fact the [jury] could reasonably deduce from the evidence," ' " and we accept logical inferences the jury might have drawn from circumstantial evidence. (*People v. Baker* (2021) 10 Cal.5th 1044, 1103.) Reversal is not warranted unless it appears " ' " 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' [Citation.]" (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

### B. Implied Malice

"Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' [Citation.] ' "To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical." ' [Citation.]" (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)

" 'Implied malice requires proof of both a physical act and a mental state.' [Citation.] . . . The test therefore involves an objective component (an intentional act endangering the life of another), and a subjective component (knowledge and disregard of the danger)." (*Pierce, supra*, 114 Cal.App.5th at p. 523.)

Our high court recently clarified what is required for the objective or physical component: "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[ ] a *high degree of probability that it will result in death.*" ' [Citations.]" (*Reyes*, *supra*, 14 Cal.5th at p. 989, italics added.)

Implied malice may be determined by circumstantial evidence. (*People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485, 502 (*Valenzuela*).) "Among the circumstances courts have found relevant in determining whether malice may be inferred are the victim's vulnerability, the number of assailants, the ferocity and duration of the attack, and the unusualness or unexpectedness of the victim's death." (*Ibid*.)

The parties agree that we must look to *People v. Cravens* (2012) 53 Cal.4th 500 (*Cravens*), which is our high court's most recent authority regarding implied malice murder involving a "sucker punch." In *Cravens*, a single "sucker punch" to the victim's head resulted in the victim's death. Before that, the 21-year-old defendant and his friends were at a bar when they confronted the victim, a 24-year-old professional surfer. (*Id*. at p. 502.) The defendant and his friends followed the victim home after the confrontation. (*Id*. at p. 503.) There was conflicting evidence as to whether several men then beat the victim while he was on the ground, or whether it was a one-on-one fight between the victim and another man who was not the defendant. (*Id*. at p. 504.) Regardless, the victim "managed to get loose, but he was unsteady and could not walk straight. [One witness] was surprised he was able to get up at all." (*Id*. at p. 505.) The defendant then " 'came flying out' and 'coldcocked' [the victim]. At the time of the blow, defendant was on the curb and [the

victim] was at street level." (*Ibid*.) Witnesses described the punch as " 'extremely hard,' " and "neighbors could hear the sound of [the victim's] skull hitting the ground." (*Ibid*.) Trial testimony established that the victim's injuries were "consistent with being punched by someone coming off a greater height and propelling him onto a concrete surface." (*Ibid*.) The cause of death was "blunt-force head injuries." (*Id*. at p. 506.)

In *Cravens*, the court found sufficient evidence of implied malice murder. (*Cravens*, *supra*, 53 Cal.4th at p. 512.) It observed that "[t]his state has long recognized 'that an assault with the fist . . . may be made in such a manner and under such circumstances as to make the killing murder.' [Citation.] However, 'if the blows causing death are inflicted with the fist, and there are no aggravating circumstances, the law will not raise the implication of malice aforethought, which must exist to make the crime murder.' [Citation.]" (*Id*. at p. 508.) The court then described the aggravating circumstances present: The defendant had "targeted a smaller and shorter victim who was intoxicated, exhausted, and vulnerable," and who was also "visibly worn out from the prior altercation." (*Ibid*.) The victim "was unsteady and unable to walk straight." (*Ibid*.) The punch was also " 'extremely hard.' " (*Id*. at p. 509.) The court reasoned that the defendant's conduct "guaranteed that [the victim] would fall on a very hard surface, such as the pavement or the concrete curb." (*Ibid*.) The court further observed that the consequences of a fall onto concrete must have been known to the defendant. (*Ibid*.) Finally, the court stated that "worst of all, defendant decked [the victim] with a sucker punch. The jury could reasonably have found that at the time defendant attacked, [the victim] posed no threat and was not behaving in an aggressive

8

manner," and the defendant "intended to catch [the victim] at his most vulnerable." (*Ibid*.)

The circumstances here are comparable to *Cravens* in several material ways. Norris was a 63-year-old walking with a cane. Like the victim in *Cravens*, he was particularly vulnerable, and his vulnerability was apparent. (See also *Valenzuela*, *supra*, 73 Cal.App.5th at pp. 503, 502 [finding implied malice where victim's arm was in a cast and sling, and "could only defend himself with one arm, and that disability was obvious"].) The jury could also reasonably infer that Mendoza punched Norris hard from the evidence that Norris suffered a one-inch subcutaneous hemorrhage behind his ear, consistent with being punched. Mendoza also knocked Norris down, face-first, so quickly that he did not attempt to brace his fall. (Cf. *People v. Spring* (1984) 153 Cal.App.3d 1199, 1205 [single punch to 64-year-old was "too weak to knock him off his feet or render him unconscious" and not an act involving high degree of probability of death].) When Mendoza punched Norris, Norris was looking away and posed no threat. Norris thus did not see Mendoza and had no opportunity to defend himself or anticipate his fall. The sucker punch caused him to fall, hit his head on the concrete sidewalk, and die. (Cf. *Cravens*, *supra*, 53 Cal.4th at p. 509 ["sucker punch" that was "without warning" guaranteed fall on "very hard" surface].)

This evidence permitted the jury to reasonably find that Mendoza's act of punching Norris involved a "high degree of probability" of death. (*Reyes*, *supra*, 14 Cal.5th at p. 989.) The jury could conclude that punching an older man, with a cane, in the back of the head, such that he could not defend himself or anticipate the fall, over concrete, "was dangerous to life in more

9

than a vague or speculative sense" because it "involved a high degree of probability that the act would result in death." (*Pierce*, *supra*, 114 Cal.App.5th at p. 529; see *People v. Tubby* (1949) 34 Cal.2d 72, 75, 76, 79 [sufficient evidence for second degree murder conviction after defendant, without provocation, struck elderly man with fists, resulting in the man's death from skull fractures and intercranial hemorrhage].) The evidence was sufficient to establish the objective component of implied malice murder.

There was also sufficient evidence to support the subjective component of implied malice murder. "This component is ordinarily proven by illustrating the circumstances leading to the ultimate deadly result." (*People v. Guillen* (2014) 227 Cal.App.4th 934, 988, citing *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 107.) The jury could reasonably infer Mendoza's subjective knowledge that his act of punching a vulnerable victim, hard, in the back of the head, from a running start, over concrete, without notice, was "predictably dangerous to human life." (*Cravens*, *supra*, 53 Cal.4th at p. 510; see *People v. Palomar* (2020) 44 Cal.App.5th 969, 977 (*Palomar*) [sucker punch onto concrete guaranteed fall on hard surface, the consequences of which would be known to defendant].)

Additionally, Mendoza's actions after the punch supported the mental component of implied malice. The video showed that Mendoza punched Norris, stood over him while he was on the ground without rendering assistance, and then walked away. There is no evidence that he demonstrated any concern for Norris or sought help for him. (*Cravens*, *supra*, 53 Cal.4th at p. 511 [defendant's conduct after sucker punch supported finding of implied malice; defendant took no steps to determine victim's

condition or obtain help and laughed about victim's injuries]; *Palomar*, *supra*, 44 Cal.App.5th at p. 978 [defendant's failure to ascertain the victim's condition or secure emergency services after sucker punch "manifested a callous indifference to human life" sufficient for implied malice].)

To the extent Mendoza relies on *People v. Vasquez* (2018) 30 Cal.App.5th 786, 796, for the proposition that generally blows inflicted with a fist are insufficient to show implied malice, we find it inapposite. *Vasquez* did not conclude that there was a lack of substantial evidence to support a jury's finding of implied malice. It concerned whether there was sufficient evidence to support an instruction on the lesser included offense of involuntary manslaughter.[2] Moreover, while it is true that generally, assault with a fist, in the absence of aggravating circumstances, will not rise to the level of malice aforethought for murder (*ibid.*, quoting *Craven*s, *supra*, 53 Cal.4th at p. 508), here there were aggravating circumstances. (Cf. *Craven*s, at pp. 508–509 [vulnerable victim; hard, sucker punch over concrete without warning].)

Viewing the record in the light most favorable to the verdict, there is substantial evidence to support the jury's finding of implied malice murder.

## II.  Implied Malice Instruction, Prosecutorial Error, and Ineffective Assistance of Counsel

Mendoza contends that several instructional errors misstated the law as to implied malice. He further asserts that statements by the prosecutor and related errors by the trial court and defense counsel compounded those instructional errors, with

---

[2]     The jury in this case was instructed on involuntary manslaughter.

the effect of reducing the prosecution's burden of proof, thereby violating his right to due process. We reject the argument that the trial court erred in its jury instruction on implied malice, but we agree that the prosecutor prejudicially misstated the law during closing arguments. We conclude that defense counsel's failure to object to the prosecutor's misstatements constituted ineffective assistance of counsel.

### A. Background

#### i. Implied malice instructions

The trial court instructed the jury with CALCRIM No. 520, which, in relevant part, stated that there were two kinds of malice aforethought: express and implied malice. The instruction explained that the defendant acted with implied malice if:

> "1. He intentionally committed the act;
> "2. The natural and probable consequences of the act were dangerous to human life in that the act involved a high degree of probability that it would result in death;
> "3. At the time he acted, he knew his act was dangerous to human life;
> "AND
> "4. He deliberately acted with conscious disregard for human life."

At the prosecutor's request, the trial court also added the following language to the standard jury instruction: "An act dangerous to human life need not be an act that would certainly lead to death. The probability of death from the act must be more than remote or merely possible." In granting the prosecutor's request, the trial court explained: "[The prosecutor] correctly points out that the authority for this is *People* [*v.*] *Reyes*. And

12

this . . . was actually mentioned in the Bench Notes of CALCRIM [No.] 520."[3]  Defense counsel did not object.

### ii.    Prosecutor's closing argument

During his closing argument, the prosecutor read the four elements of implied malice from CALCRIM No. 520, including the "second element, 'the natural and probable consequence[s] of the act were dangerous to human life and the act involved a high degree of probability that it would result in death.' "  The prosecutor told the jury: "I'm gonna talk about that in just a moment."  After discussing other aspects of implied malice, the prosecutor returned to the second element, stating: "So dangerous to human life—right?—It first says 'the act involved a high degree of probability that it will result in death.'  It gives you this definition right down here.  That 'an act dangerous to human life need not be an act that will certainly lead to death.  The probability of death from the act must be more than remote or merely possible.'  Right?"

The prosecutor continued: "So this is telling you what that means in that second element.  This act [is] dangerous to human life.  Right?  It doesn't have to be that every time that you punch someone—is it possible—right?  That Mr. Norris could have been punched in the back of the head, fell down and hit his head on the pavement and not died?  Of course.  Of course that's possible and that could have happened.  Right?  [¶] So it's not an act that

---

[3]    The authority section following CALCRIM No. 520 stated: " 'Dangerous to Human Life' Defined.  *People v. Reyes* (2023) 14 Cal.5th 981,989 [309 Cal.Rptr.3d 832, 531 P.3d 357]."  (Judicial Council of Cal., Crim. Jury Instns. (2024) Authority to CALCRIM No. 520, p. 251.)  However, the notes did not specifically identify the language used in the supplemental instruction here.

13

would certainly lead to death in every situation. And that's not required. But the probability from that act happening . . . sucker-punching an older person walking with a cane over concrete, the probability of death from that has to be more than something that is so remote or just merely possible. [¶] And, certainly, that is the case that we have here. Right? Anybody knows that if you fall down—right?—and hit your head on the concrete, it is more it [*sic*] than just a remote possibility that you could die, especially when you are an older person, you're walking with the assistance of a cane. It's certainly more than something that is just remote or merely possible."

After discussing involuntary manslaughter and providing examples of what might qualify as acting in a reckless way that creates a high risk of death, as compared to conscious disregard for human life, the prosecutor said: "But these examples . . . and we talked about this, about these factors that can change an act into having more than a remote or mere possibility of causing death. So when you have these factors, this is what an involuntary manslaughter is. And we have nothing that is even close to this in this case. [¶] So, finally, you have murder, which means implied malice. 'An act that will certainly lead to death is not required. The probability of death from the acts must be more than remote or merely possible. A conscious disregard for human life.' "

Near the end of closing, the prosecutor reminded the jury, "I have to prove my case to you beyond a reasonable doubt," and pointed to an instruction stating that " 'proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.' " The prosecutor explained what an "abiding conviction" meant and ended by stating that in this matter it

14

would mean a "lasting belief that Mr. Mendoza showed a conscious disregard for human life and that his actions of punching Mr. Norris in the head like he did, that the chance of death from that simply was more than remote or merely possible. That's the question that you have to ask yourself."

In the rebuttal argument, the prosecutor reminded the jury that because defense counsel had conceded that Mendoza was guilty of involuntary manslaughter, the question before them was, "Did the defendant show a conscious disregard for human life with his actions. And if the answer to that question is, yes, if you believe that the act, what Mr. Mendoza did was dangerous to human life because if . . . the consequences of the act made death more than a remote or mere possibility, if the answer to those two questions is yes then he's guilty of the murder."

The prosecutor later continued: "And so I'm just going to end on saying, again, that the choice that you have here . . . is that they've already said he's guilty of the involuntary manslaughter. Conscious disregard for human life and the fact that someone would know that that act, of all the factors I've said many times . . . would be more than a remote or [a] mere possibility or probability of causing death."

## B.    Forfeiture

The People contend Mendoza forfeited any objection to the jury instructions by failing to object in the trial court. Generally, failure to object to a jury instruction forfeits a claim of error on appeal. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 471.) The People argue that Mendoza also forfeited his claim of error as to any prosecutorial misconduct during closing argument by failing to object. Again, generally " ' "[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely

fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety." ' [Citations.] The defendant's failure to object will be excused if an objection would have been futile or if an admonition would not have cured the harm caused by the misconduct." (*People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*).)

We agree that Mendoza's claims of error are forfeited. Defense counsel did not object and there is no reason to believe the failure to object was excused. However, Mendoza also asserts that his trial attorney's failure to object to the instruction or the prosecutor's argument constituted ineffective assistance of counsel. (*People v. Lopez* (2008) 42 Cal.4th 960, 966.) We therefore address the underlying claims of error in the context of ineffective assistance of counsel.

## C. Ineffective assistance of counsel

### i. Legal principles

"The Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution guarantee a criminal defendant the ' "right to the effective assistance of counsel at trial." ' (*In re Lucas* (2004) 33 Cal.4th 682, 721; see *ibid*. [a defendant is ' " 'entitled to the reasonably competent assistance of an attorney acting as his diligent and conscientious advocate' " ']; *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) 'The ultimate purpose of this right is to protect the defendant's fundamental right to a trial that is both fair in its conduct and reliable in its result.' (*People v. Ledesma* (1987) 43 Cal.3d 171, 215 [ ].)" (*In re Long* (2020) 10 Cal.5th 764, 773 (*Long*).)

16

To prevail on his claim, Mendoza must show that defense counsel's omission " 'fell below an objective standard of reasonableness' (*Strickland*, *supra*, 466 U.S. at p. 688; [citation]) in light of 'the professional norms prevailing when the representation took place' [citation].  [Mendoza] must also show 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' (*Strickland*, at p. 694.)  [Mendoza] 'need not show that counsel's deficient conduct more likely than not altered the outcome in the case.' (*Id*. at p. 693.)  It is enough to show 'a probability sufficient to undermine confidence in the outcome.' (*Id*. at p. 694.)  [¶] '[T]he standard for judging counsel's representation is a most deferential one.' [Citation.]  We 'must indulge a "strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight.' [Citation.]  'Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.' [Citation.]  Accordingly, we must 'reconstruct the circumstances of counsel's challenged conduct, and . . . evaluate the conduct from counsel's perspective at the time.' (*Strickland*, *supra*, 466 U.S. at p. 689.)" (*Long*, *supra*, 10 Cal.5th at pp. 773–774.)

### ii. The prosecutor's argument misstated the law regarding the objective component of implied malice

As noted above, the *Reyes* court reiterated that the objective component of implied malice requires that the defendant's act "not merely be dangerous to life in some vague or

17

speculative sense; it must ' "involve[ ] a *high degree of probability that it will result in death.*" ' [Citations.]" (*Reyes*, *supra*, 14 Cal.5th at p. 989, italics added.) Two citations followed this statement in *Reyes*, one to *People v. Knoller* (2007) 41 Cal.4th 139, 152 (*Knoller*), for the same proposition, and a second to Justice Liu's concurring opinion in *Cravens*. The citation to *Cravens* included a parenthetical quote: "['Although an act that will certainly lead to death is not required, the probability of death from the act must be more than remote or merely possible.']" (*Reyes*, at p. 989, quoting *Cravens*, *supra*, 53 Cal.4th at p. 513 (conc. opn. of Liu, J.).) This quoted sentence was the source of the additional language the court added to CALCRIM No. 520 in this case.

In his concurring opinion in *Cravens*, Justice Liu commented on the "two lines of decisions that attempt to delineate the objective and subjective components of implied malice." (*Cravens*, *supra*, 53 Cal.4th at p. 512 (conc. opn. of Liu, J.).) One test derived from *People v. Thomas* (1953) 41 Cal.2d 470, the other from *People v. Phillips* (1966) 64 Cal.2d 574. The concurrence described the *Thomas* test: "Under *Thomas*, the objective component of implied malice requires 'an act that involves a high degree of probability that it will result in death.' (*Thomas*, *supra*, 41 Cal.2d at p. 480 (conc. opn. of Traynor, J.).) This test recognizes that the ultimate inquiry involves a determination of probability: Although an act that will certainly lead to death is not required, the probability of death from the act must be more than remote or merely possible. The *Thomas* test strikes that balance by requiring a 'high degree of probability' of death." (*Cravens*, at p. 513 (conc. opn. of Liu, J.).)

18

Justice Liu's concurrence did not suggest that " 'a high degree of probability that [the act] will result in death' " is the *equivalent* of a probability of death that is simply "more than remote or merely possible." (*Cravens*, *supra*, 53 Cal.4th at p. 513 (conc. opn. of Liu, J.).) Thus, while stating that implied malice requires an act that creates a probability of death that is "more than remote or merely possible" is accurate, it is also potentially misleading because it does not explain how *much* more than remote or how much greater than *merely* possible the probability must be. The law answers this question, however. Implied malice requires a *high degree* of probability that the act will cause death.

Thus, although the jury instruction given here was not an incorrect statement of the law, the added language created an ambiguity about what degree of probability of death was necessary for the jury to find the natural and probable consequences of Mendoza's act were dangerous to human life. The instruction deleted "although" from the language of Justice Liu's concurrence in *Cravens*, and created two sentences instead of one. As a result, it failed to describe a continuum of probability in which "high degree" falls somewhere between an act that would certainly lead to death and an act that is nothing more than remote or merely possible. This risked creating the impression that "a high degree of probability" is *equivalent* to "more than remote or merely possible." The prosecutor exploited that ambiguity in his closing arguments.

Where "the prosecutor is alleged to have misstated the law to the jury, this constitutes error only if (1) the prosecutor misstated the law, and (2) there is ' "a reasonable likelihood the jury understood or applied the [prosecutor's remarks] in an

19

improper or erroneous manner." [Citations.]' [Citations.]" (*People v. Collins* (2021) 65 Cal.App.5th 333, 340.) We " 'objective[ly]' examine how a 'reasonable juror' would likely interpret the prosecutor's remarks [citations], bearing in mind that ' "we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" ' [Citation.]" (*Ibid*.)

Here, the prosecutor's closing argument first informed the jury that a high degree of probability of death is *defined* as a probability of death that is more than remote or merely possible. This was, at best, misleading. The misleading nature of the comment was then aggravated by the prosecutor's repetition of "more than remote or merely possible" as the relevant standard, divorced from the language requiring a high degree of probability of death. In some instances, the prosecutor added words weakening the standard even further, such as: "Sucker-punching an older person walking with a cane over concrete, the probability of death from that has to be more than something that is *so remote or just merely possible*"; "Anybody knows that if you fall down . . . and hit your head on the concrete, it is *more . . . than just a remote possibility* that you could die"; the jurors needed to have an abiding conviction that Mendoza's "actions of punching Mr. Norris in the head . . . that the chance of death from that *simply was more than remote or merely possible*"; and the jurors had to decide only two questions to find Mendoza guilty of murder, one of which was whether Mendoza's act was dangerous to human life "because . . . the consequences of the act made death more than a remote or mere possibility."

These statements misstated the law by repeatedly suggesting that, rather than finding Mendoza's punch created a

20

high degree of probability of death, the jury *only* had to conclude that the probability of death from the punch was more than remote or more than merely possible.

### iii. Defense counsel's failure to object to the prosecutor's statements fell below an objective standard of reasonableness

Defense counsel did not object to the prosecutor's repeated misstatements of the law. Mendoza contends this failure deprived him of the effective assistance of counsel.

We acknowledge that, in general, " '[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected." (*People v. Wilson* (1992) 3 Cal.4th 926, 936.) Moreover, "because, in general, it is inappropriate for an appellate court to speculate as to the existence or nonexistence of a tactical basis for a defense attorney's course of conduct when the record on appeal does not illuminate the basis for the attorney's challenged acts or omissions, a claim of ineffective assistance is more appropriately made in a habeas corpus proceeding, in which the attorney has the opportunity to explain the reasons for his or her conduct." (*Ibid*.) Additionally, " '[t]he decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one . . .' [citations], . . . and 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence' [citation]." (*Centeno*, *supra*, 60 Cal.4th at p. 675.)

Here, however, we are constrained to conclude that there could be no satisfactory explanation for defense counsel's failure

to object to the prosecutor's repeated misstatements of the law during closing arguments. The defense had conceded that Mendoza was guilty of at least involuntary manslaughter. As a result, the only issue Mendoza could seriously contest was whether the prosecution established that he acted with implied malice. Central to that determination was the issue of whether Mendoza's single blow with a fist was an act that carried a high degree of probability of causing death. The prosecutor's statements in closing argument urged the jury to employ a test for implied malice that was inaccurate and lessened the prosecution's burden.

While defense counsel in some instances may make a tactical decision not to object to misstatements of the law during a prosecutor's closing argument to avoid drawing attention to an issue or confusing the jury, or because an objection was likely futile, or because the incorrectness of the prosecutor's statement was less than clear, none of those decisions would have been objectively reasonable in this case. There was no basis for defense counsel to suspect that the trial court would overrule an objection. She did not object at all during the prosecutor's argument and the court in fact sustained a prosecution objection during the defense closing argument, suggesting a willingness to entertain objections during closing arguments. Further, there had been no meaningful discussion of the "more than remote or merely possible" language when counsel and the court reviewed the jury instructions, thus defense counsel had no reason to believe the court would necessarily reject an objection.

Since the trial court had instructed the jury that if there was any conflict between the jury instructions and counsel's arguments the jurors must follow the instructions, it may have

been reasonable for defense counsel not to object after the first few times the prosecutor made the offending statements. But this became unreasonable after the fifth, sixth, and seventh times the prosecutor told the jury it only had to conclude that death was more than a remote or merely possible result of Mendoza's act. Mendoza has established that defense counsel's failure to object "fell short of prevailing professional standards of reasonableness." (*People v. Stratton* (1988) 205 Cal.App.3d 87, 93.)

We also conclude that Mendoza has demonstrated "a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' (*Strickland, supra,* 466 U.S. at p. 694.)" (*Centeno, supra,* 60 Cal.4th at p. 676.) On this issue, we find our high court's analysis in *Centeno* instructive.

In *Centeno*, the defendant was accused of molesting a child. At trial, the victim's testimony was inconsistent, her father recanted earlier statements he had made to law enforcement inculpating the defendant, and the defendant denied any misconduct. (*Centeno, supra,* 60 Cal.4th at p. 677.) During the prosecutor's closing argument, she made incorrect and misleading statements about the beyond a reasonable doubt standard of proof, including using an improper hypothetical. Defense counsel did not object, however, and the issue of prosecutorial misconduct was forfeited. (*Id.* at p. 674.)

The *Centeno* court found defense counsel's failure to object deprived the defendant of the effective assistance of counsel. "[T]he problems with the prosecutor's argument were not difficult to discern." (*Centeno, supra,* 60 Cal.4th at p. 675.) The improper argument was "particularly misleading" and struck "at the most

23

fundamental issue in a criminal case." (*Ibid*.) Further, the argument was "too powerful and pivotal to dismiss as irrelevant or trivial argument. Additionally, the argument was aimed at lessening, not heightening, the burden of proof." (*Ibid*.) The improper argument was in the prosecutor's rebuttal; thus, defense counsel could not counter it with his own argument and his "only hope of correcting the misimpression was through a timely objection and admonition from the court." (*Id*. at p. 676.) Our high court thus could "conceive of no reasonable tactical purpose for defense counsel's omission." (*Ibid*.)

As to prejudice, the court held that factors that could have lessened the impact of the prosecutorial error, such as correct instructions on reasonable doubt, defense objections to improper argument, trial court admonitions, and strong evidence, were not present. The jury had no reason to reject the prosecutor's improper hypothetical, which "did not directly contradict the trial court's instruction on proof beyond a reasonable doubt, but instead purported to illustrate that standard. . . . Because there was no timely objection, the trial court did not admonish the jury to disregard the prosecutor's argument." (*Centeno*, *supra*, 60 Cal.4th at p. 676.) The court did not reinstruct on reasonable doubt, leaving the prosecutor's misleading or incorrect argument as "the last word on the subject." (*Id*. at p. 677.) In addition, the case was very close. The court therefore concluded: "Given the closeness of the case and the lack of any corrective action, there is a reasonable probability that the prosecutor's argument caused one or more jurors to convict defendant based on a lesser standard than proof beyond a reasonable doubt. Accordingly, defendant's convictions cannot stand." (*Ibid*.)

24

The circumstances here are similar.  There was no reason for the jury to reject or question the prosecutor's description of the requirements of implied malice because it was facially consistent with the court's jury instruction.  There was no defense objection.  The trial court therefore did not admonish the jury to disregard the prosecutor's argument or redirect the jury to the full instruction on the law.  Although defense counsel had the opportunity to correct the prosecutor's misstatements in the defense closing argument, she failed to do so.

Indeed, defense counsel did not expressly discuss the elements of implied malice in her closing argument.  Defense counsel asserted there was "substantial evidence indicating that [Mendoza] acted without conscious disregard for human life and did not form the intent to kill" because "there was no evidence proving that there was any relationship, any contact, any— anything with Mr. Norris."  She also asserted: "There was no contact.  There was no provocation.  There was no implied malice. It was one blow.  There was no evidence that [Mendoza] followed Mr. Norris or went to a park and—and fought with him.  There was no fight.  [¶] . . . [¶] Mr. Norris, unluckily, did receive a blow to the back of his head.  And it was not the cause of death.  The cause of death was after the blow to the head; it is when he fell."

After arguing that the lack of any evidence of motive meant the jury could not "impute a malice here"; questioning the credibility of the medical examiner; and reviewing the instructions about circumstantial evidence and reasonable doubt, defense counsel closed with the following: "And I—I don't want to make you feel like you can't care for Mr. Norris, but the—having the district attorney make you feel like he was—because he was walking with a cane that he was somehow disabled or that he

25

was—he was out walking—and he seemed to be walking pretty well. He wasn't a doddering old man. And—and he was a person. [¶] So to make you believe that he was on death's door or at least unable to walk and the cane and the—I don't know. It just— [¶] Be reasonable and—and find [Mendoza] guilty of involuntary manslaughter. It is the reasonable choice."

While some of defense counsel's closing remarks were relevant to whether Mendoza acted with implied malice, they did nothing to counteract the prosecutor's repeated implicit and explicit argument that as long as the jury concluded Mendoza's act had anything more than a remote chance or mere possibility of causing death, that satisfied the "high degree of probability" of death element of implied malice. The prosecutor was able to repeat this incorrect formulation of the objective component of implied malice in his rebuttal argument, again without objection, as the last word the jury heard before beginning deliberations.

Moreover, while the evidence was sufficient to support a finding that Mendoza's act carried a high degree of probability of death (*Knoller*, *supra*, 41 Cal.4th at p. 152), we disagree with the People's assertion that the evidence was overwhelming. Mendoza punched Norris only once. Norris was an older man, but, at 63 years old, not extremely aged. The surveillance video established Norris was walking with a cane, but did not clearly demonstrate that he was otherwise frail, unsteady, or likely to be felled by one blow. Given the relatively few aggravating factors and the "lack of any corrective action" (*Centeno*, *supra*, 60 Cal.4th at p. 677), there is a reasonable probability that the prosecutor's argument caused one or more jurors to convict Mendoza based on an incorrect, and less stringent, test for whether his act was dangerous to human life.

26

Mendoza's conviction for second degree murder must therefore be reversed.  He may be retried.  We need not address the remainder of his arguments regarding other alleged errors at trial or error in his sentence.  Mendoza does not challenge the judgment as to the assault conviction and accompanying sentence.

## DISPOSITION

The judgment is reversed as to count one.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EDMON, P. J.

HANASONO, J.